IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

**RAMAH NAVAJO CHAPTER,** and
other similarly situated entities,

                Plaintiffs,

vs.                                           No. CIV 90-0957 LH/WWD

**BRUCE BABBITT**, Secretary of the
Interior; **EDDIE BROWN**, Assistant
Secretary of the Interior; **MARVIN
PIERCE**, Chief of the Office of
Inspector General, U.S. Department
of the Interior; and **THE UNITED
STATES OF AMERICA**,

                Defendants.

**MEMORANDUM OPINION MAKING
FINDINGS OF FACT AND CONCLUSIONS OF LAW,
APPROVING PARTIAL SETTLEMENT AGREEMENT, AND
AWARDING ATTORNEYS' FEES AND COSTS**

      **THIS MATTER** comes before the Court on the parties' Joint Motion for Preliminary and

Final Approval of Partial Settlement Agreement and Order that Notice be Sent to the Class (Docket

No. 195), filed August 31, 1998, and the Application of Class Counsel for an Award of Attorney's

[sic] Fees and Costs (Docket No. 201), filed October 2, 1998.  Having considered the relevant

pleadings, arguments of counsel, all filed objections, and the applicable law, the Court finds that the

Partial Settlement Agreement is in the best interests of the Class and will be **approved**, and that the

Application for Attorney's Fees is generally well taken and will be **granted in part** and **denied in

part**.

This matter was originally filed in this Court in 1990. The named representative, the Ramah Chapter of the Navajo Nation (RNC), and the Class were seeking reimbursement for unpaid indirect costs incurred while providing services under Indian Self-Determination Act contracts. The Plaintiffs alleged that the formula the Bureau of Indian Affairs used to calculate these indirect costs resulted in serious underpayments which the tribal entities had to absorb in their already strapped budgets. This Court granted summary judgment in favor of the Defendants, finding that the BIA formula conformed with the applicable statues. After this holding was reversed by the Tenth Circuit, the parties entered into intensive settlement negotiations which resulted in the remarkable Partial Settlement Agreement (PSA) now before the Court.

The Court held an evidentiary hearing and listened to arguments by the parties and Objectors on December 16, 1998. The Court has carefully considered the evidence and arguments presented at this hearing. The Court has also reviewed and considered the Plaintiffs' and Class Counsel's Requested Findings of Fact and Conclusions of Law as to the Partial Settlement Agreement and the Application for Award of Attorney's Fees and Costs—many of which are incorporated below—(Docket No. 265); the affidavits filed in support of the Partial Settlement Agreement and the Application (Docket Nos. 203-206, 212-214, 217); the various objections that have been filed with the Court (Docket Nos. 218-219, 221, 225, and 238); the Objectors' Proposed Findings of Fact and Conclusions of Law and Objections to Plaintiffs' and Class Counsel's Proposed Findings of Fact and Conclusions of Law (Docket No. 272); the Plaintiffs' Supplemental Memorandum on Issues Raised by the Court at the Hearing on December 18, 1999 (Docket No. 270); and the Plaintiffs' Supplemental Attorneys' Costs (Docket No. 263). The Court would also note that it has entered a

Stipulated Order offered by the Class and the Red Lake Band that resolves the Red Lake Band's dispute with the Class and its objections to the Partial Settlement Agreement. That Order explicitly denied the Red Lake Band's objections with prejudice. (*See* Stipulated Order ¶¶ 6-8 (Docket No. 274), filed January 13, 1999.) The Court has not considered those now defunct objections.

<h2 style="text-align:center">OBJECTIONS</h2>

Although many of the issues raised by the Objectors are addressed in the Court's Findings of Fact and Conclusions of Law, it is appropriate to first review the objections and the relevant law generally. As the Court has just noted, the most significant of those objections, raised by the Red Lake Band, have been denied by the entry of the Stipulated Order. The remaining objections fall into two general categories: objections based on the so-called Judgment Fund issue and objections to the Application for Attorneys' Fees.[1] The Court has concluded that the former is a non-issue insofar as its analysis of whether the Partial Settlement Agreement is fair, reasonable and adequate, however, the Court finds that the objections to the Attorneys' Fee Application merits some consideration.

**Judgment Fund Objections**

The Judgment Fund is created by the Contract Disputes Act to pay for awards granted against the United States. The Contract Disputes Act requires that the Judgment Fund be reimbursed after an award "by the agency whose appropriations were used for the contract out of *available funds or by obtaining additional appropriations* for such purposes." 41 U.S.C. § 612(c) (emphasis added).

---

[1] There are some additional minor objections to: (1) the separate partial settlement for named Plaintiff Ramah Navajo Chapter (PSA ¶ 4.), (2) the award of $250,000 to the National Congress of American Indians for a study of indirect costs and contract support issues (PSA ¶ 7(a), (c).), and (3) the restriction that the use of the award be limited to "any lawful purpose or expenditure (direct or indirect) that would be permitted under any self-determination contract under Section 102 of the ISDEAA, as amended" (PSA ¶ 12.). The Court will address these more minor objections in its conclusions of law below.

This requirement is recognized and addressed in paragraph eleven of the Partial Settlement Agreement. In that paragraph the parties agree that issues relating to the Judgment Fund (*i.e.* its reimbursement) are not settled or released in the Agreement, although a Judgment Fund dispute will not form the basis for reopening this Agreement either. (*See* PSA ¶11(a).)

While asserting that this issue is not ripe for adjudication, the Defendants have nonetheless agreed that they will not seek to pay back the Judgment Fund from the regular appropriation for the operation of programs under the Indian Self Determination Act, unless they are required to, and that they will take "actions to support reasonable efforts to minimize or eliminate [the] impact" of the Judgment Fund repayment requirement. (*Id.* at ¶¶ 11(d-e).) The Objectors are concerned that the Agreement does not adequately guard against the Judgment Fund being reimbursed from their operating budgets, which would result in an illusory award. As the Class has repeatedly pointed out, however, this issue would exist whether the award was the result of a trial or a settlement. Moreover, the Court agrees with the Defendants that this issue is not justiciable until they actually make the award illusory by funding it out of the tribes' regular appropriation. Such a shell game would clearly be inequitable and the Court will retain jurisdiction to ensure that the Government does not engage in such charlatanism—though the Objectors' fears appear to be unfounded.[2]

**Application for Attorney's Fees**

At the outset, the Court notes that there are two generally accepted means for awarding

---

[2] In addition to the assurances of the Government's able counsel, Class Counsel has informed the Court of congressional testimony which indicates that supplemental funding to reimburse the Judgment Fund will be obtained without affecting the annual tribal appropriations. *See* Letter from Michael P. Gross, Class Counsel, to United States Senators Ben Nighthorse Campbell and Daniel K. Inouye, Chairman and Vice Chairman, Senate Committee on Indian Affairs (February 26, 1999) (on file with the Court, vol. IV). Such action would moot this issue.

attorneys' fees in class action suits, the so called lodestar method—determining fees based on the hours worked and a reasonable hourly fee—and the percentage-of-the-fund method—awarding fees based on a reasonable percentage of the overall award. *See* ALAN HIRSCH AND DIANE SHEEHEY, AWARDING ATTORNEYS' FEES AND MANAGING FEE LITIGATION 63-67 (Federal Judicial Center 1994) Relying on a percentage-of-the-fund analysis, Class Counsel has proposed an attorneys' fee award of 12.5% of the Common Fund plus costs. The Objectors attack Class Counsel's exclusive reliance on percentage-of-the-fund methodology—asserting that a lodestar analysis would ensure the reasonableness of the award—and argue that the 12.5% figure is grossly overstated. They propose either an award based exclusively on a lodestar analysis or a significantly lower percentage award of 2.5% of the Common Fund. The Objectors do not attack the proposed award for costs.

"The award of attorneys' fees is based on substantially different underlying purposes in a common fund case than in a statutory fees case. The common fund doctrine 'rests on the perception that persons who obtain the benefit of a lawsuit without contributing to its costs are unjustly enriched at the successful litigant's expense.'" *Brown v. Phillips Petroleum Company*, 838 F.2d 451, 454 (10th Cir. 1988) (quoting *Boeing Co. v. Van Gemert*, 844 U.S. 472, 478 (1980)). Thus, the percentage award results "in a sharing of the fees among those benefitted by the litigation." *Brown*, 838 F.2d at 454. This purpose can be achieved through the application of either the lodestar or percentage methodologies, so long as the fees are assessed to the common fund as a whole. The Tenth Circuit has observed that although there are advantages and disadvantages to the lodestar and percentage-of-the-fund methodologies, the "recent trend has been toward utilizing the percentage method in common fund cases." *Gottlieb v. Barry*, 43 F.3d 474, 482 (10th Cir. 1995); *see also In re Horizon/CMS Healthcare Corp. Securities Litigation*, 3 F.Supp.3d 1208, 1211 (D.N.M. 1998);

Report of the Third Circuit Task Force, *Court Awarded Attorney Fees*, 108 F.R.D. 237, 255-56 (1985); HIRSCH & SHEEHEY, AWARDING ATTORNEYS' FEES AND MANAGING FEE LITIGATION at 63-66.

The District of Columbia Circuit has further explained that the percentage-of-the-fund method is preferred as it rewards prompt and efficient resolution of class action litigation, while the lodestar approach's reliance on attorney work hours conversely encourages inefficiency and resistance to prompt settlement. *Swedish Hospital Corp. v. Shalala*, 1 F.3d 1261, 1268 (D.C. Cir. 1993). "Furthermore, a percentage-of-the-fund approach more accurately reflects the economics of litigation practice . . . and most closely approximates the manner in which attorneys are compensated in the marketplace for these types of cases." *Id.* at 1269 (citations omitted); *see also* HIRSCH & DIANE, AWARDING ATTORNEYS' FEES AND MANAGING FEE LITIGATION at 65 (noting that the percentage method "ensure[s] that the fee award will stimulate the marketplace, since most common fund cases are the kinds of cases normally taken on a contingency fee basis, with counsel promised a percentage of any recovery").

Despite its advantages, courts do not blithely grant the percentage requested by prevailing counsel. "Most district courts select a percentage in the 20% to 30% range, and the Ninth Circuit has indicated that 25% is the 'benchmark' award." *Id.* at 68. In *Brown*, 834 F.2d at 454, the Tenth Circuit directed that in determining what percentage would be reasonable, courts should review the twelve factors articulated by the Fifth Circuit in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 717-19 (5th Cir. 1974). The *Johnson* factors are:

> (1) the time and labor involved; (2) the novelty and difficulty of the questions; (3) the skill requisite to perform the legal service properly; (4) the preclusion of other employment by the attorney due to acceptance of the case; (5) the customary fee; (6)

any prearranged fee--this is helpful but not determinative; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the undesirability of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases.

*Brown*, 838 F.2d at 454-55 (citing *Johnson*, 488 F.2d at 717-19). The Tenth Circuit cautioned however, that while the *Johnson* factors are relevant, they were developed in the statutory fee context and "the inherent differences between statutory fee and common fund cases could justify a trial judge's decision to assign different relative weights to those factors in the two types of cases." *Brown*, 838 F.2d at 455. The *Brown* court, in fact, specifically held "that in awarding attorneys' fees in a common fund case, the 'time and labor involved' factor *need not* be evaluated using the lodestar formulation when, in the judgment of the trial court, a reasonable fee is derived by giving greater weight to other factors, the basis of which is clearly reflected in the record." *Id*. at 455 (emphasis added).

Such is the case here. The Court will discuss its application of the *Johnson* factors to this fee request in its conclusions of law below. Generally, however, it is the judgment of the Court that the percentage-of-the-fund method is the appropriate means to determine a reasonable fee in this instance. Moreover, the Court concludes that a lodestar analysis would not be helpful in setting or even evaluating a reasonable percentage of the Common Fund. Rather the Court finds that the other *Johnson* factors—most significantly the novelty and difficulty of the questions, the skill required, and the custom of contingency fee arraignments in similar cases—would help the Court more accurately determine a reasonable percentage of the fund to award in attorneys' fees.

**FINDINGS OF FACT**

1.   After passage of Pub. L. 100-472, amendments to the Indian Self-Determination And Education Assistance Act of 1975 (ISDA), 25 U.S.C. §§450 *et seq.*, the Ramah Navajo Chapter submitted a proposal to its cognizant agency, the Office of Inspector General (OIG), Department of the Interior, for an indirect cost rate for Fiscal Year 1989.

2.   The proposal omitted other federal programs from the direct cost base making up the indirect cost rate.

3.   RNC omitted the other federal monies (also known as state funds because they were passed from the federal agencies through state agencies) from its direct cost base.  It took this action because the practice of OIG to include the other federal monies had depressed the rate and as a consequence lowered RNC's recovery of indirect cost funds.  OIG's policy was a result of its analysis of the requirements of the Office of Management and Budget's Circular A-87 (OMB A-87).

4.   Indirect costs for ISDA contractors are generally fixed, not variable.  Also, other federal agencies do not typically pay their fair share of indirect costs as determined by the OMB A-87 system.  As a result of the inclusion of other federal agencies' programs in the base, the indirect cost rate is reduced.  Under the OMB Circular A-87 system followed by the Defendants, the BIA then applied the rate to its portion of the direct base each year.

5.   Because other federal agencies are under statutory or regulatory restrictions as to supplemental payment of indirect costs for administration of their programs, the result of the BIA system including the rate-making negotiation pursuant to the OMB A-87 Circular was to chronically underfund RNC and other Class members in terms of their reimbursement of indirect costs.

6.  These underpayments or shortfalls had two elements: (1) given the fixed nature of indirect costs, the shortfalls produced less than full need for monies required by RNC and the Class members to operate BIA programs; and (2) the shortfalls produced less than the full need for monies to operate programs of other federal agencies "associated with" their ISDA contracts.  *See* 25 U.S.C. § 450j-1(d)(2).

7.  OIG rejected RNC's proposal for FY 1989, insisting that OMB Circular A-87 required the inclusion of the other federal programs in the base.

8.  RNC filed a contract dispute which was denied, at which point RNC filed this action.  The single cause of action pursued in this case through appeal is the so-called "other-federal-agencies" issue having to do with the insistence of the Defendants that OMB Circular A-87 serve as the basis for determining entitlements to indirect cost (contract support) recoveries under ISDA.  There are several other ways in which the Defendants may have underpaid indirect costs to the Class, but these were not pursued in this case and do not overlap with the cause of action resolved by this Settlement. Claims based on such other underpayments of indirect costs have not been released in the proposed Settlement.

9.  The procedural history of the case through appeal is recounted in the Tenth Circuit decision, *Ramah Navajo Chapter v. Lujan*, 112 F.3d 1455 (10th Cir. 1997).

10.  Upon remand from the Tenth Circuit, the parties commenced settlement negotiations. These negotiations lasted approximately one year and have produced the proposed Agreement, which is the subject of this proceeding.

**Nature of The Negotiations**

11.   The negotiations proceeded at arm's length and were conducted on both sides by seasoned legal counsel.  There was no collusion.

12.  The parties met approximately monthly in Washington, D.C.; Albuquerque and Santa Fe, New Mexico; and Tempe, Arizona, from September 1997 through April 1998.  One or more lawyers for each party met informally on numerous occasions thereafter until the Settlement Agreement was signed on August 31, 1998.

13.   United States Magistrate William W. Deaton of this District mediated two of these sessions and former United States Magistrate John Cooley of Chicago mediated a four-day session in Tempe, Arizona.  Both mediators have applauded the Settlement.

14.  The Class consists of Pub. L. 93-638 (ISDA) contractors, compactors, and grantees, all Indian tribes or organizations.  For settlement purposes the Class has been reconfigured, with the approval of this Court, so that it includes only those P.L. 93-638 contractors or entities whose cognizant agency is the Interior Department; that is, those entitles who are entitled to the relief that was obtained.

15.  The subject of indirect costs and their applicability to ISDA is a specialized area.  Only a limited number of law firms and lawyers in the country are familiar with this field.

16.  In the negotiations, the parties first addressed methods by which they would quantify the damages suffered by the Class.  This exercise was complicated by the absence of guidance on this issue from the Tenth Circuit.

17.  The parties assembled voluminous data and materials, largely from computer records maintained by OIG and written reports to Congress compiled by the BIA.  Plaintiffs hired several

accounting firms and each negotiation session was attended by the Class accounting and indirect costs expert, John O. Donham.

18. The negotiations were monitored by several organizations and Class members. These included the National Congress of American Indians (NCAI), the nation's largest Indian tribal membership organization with some 250 member tribes; the United South and East Tribes (USET), with a membership of approximately twenty tribes; and the Oglala Sioux Tribe of South Dakota, one of the largest Class members. In addition, Class Counsel conferred continuously with several lawyers and law firms with clients who are Class members and who had been engaged by their clients to monitor the negotiations. These firms included the Sonosky Firm of Washington, D.C., Anchorage, Alaska, and Juneau, Alaska; and Hobbs, Straus, Dean & Walker P.C., of Washington, D.C. and Portland, Oregon. These firms reviewed Class Counsel's position papers and draft settlement agreements and offered comments on issues raised in them. None of the Class members represented by these firms has objected to the Settlement or the Fee Application. None of those firms will receive any monetary benefit from this Settlement.

19. The Named Class Representative Ramah Navajo Chapter actively supported the law suit. For the first years of the lawsuit it paid counsel's legal fees at the rate of $65 per hour and reimbursed incurred costs. It expended approximately $100,000 in this manner. In addition, it helped originate the legal theory which comprised the cause of action pursued successfully in this case. Finally, it actively assisted the negotiations by attending each session and participating in the negotiations.

20. Had RNC not performed these services, the success achieved may not have occurred or may have been delayed. Its risk of not recovering its expenditures for this case was high.

21.  NCAI also participated actively in the negotiations.  In addition, it has created a Task Force comprised of knowledgeable lawyers and accountants representing Class members to review the indirect cost system for ISDA as it exists in the BIA and Indian Health Service (IHS) systems. The Task Force includes representatives of the BIA, the IHS and the General Accounting Office.  It has met at least six times and a subcommittee has met at least three additional times.  Class Counsel serve on the Task Force and the subcommittee.

22.  The aim of the Task Force is to produce a recommendation to Congress and to the agencies to reform the indirect cost system so that funding of indirect costs is stable, adequate, and predictable.

23.  These various activities, directed toward analyzing and reforming the indirect cost system, were spawned in part by the Tenth Circuit's decision in this case and by the negotiations culminating in this proposed Settlement.

24.  The issues resolved in the negotiations included:

     A.  Determination of a method for calculating damages;

     B.  Interest;

     C.  The distribution of the Common Fund;

     D.  The nature of the release; and

     E.  Uses to which Class members may put their Settlement shares.

Each of these issues was hard fought.  Moreover, the parties have reached amicable preliminary agreements on the so-called Judgment Fund issue.  Complete resolution was limited only by these Executive Branch Defendants' inability to bind Congress to appropriate supplemental funding to reimburse the Judgment Fund.  As noted above, this matter appears to be approaching an adequate

resolution. The Court will retain jurisdiction over this issue, should its intervention become necessary.

25. In addition, the Settlement provides for certain equitable concessions by the Defendants as to the potential Judgment Fund issue. These include advance notice of any proposed payback from appropriations for tribal programs of the BIA or decided upon by the Defendants; a promise not to seek repayment from BIA tribal programs unless legally required; and a commitment by Defendants to use reasonable means to mitigate or eliminate any problem caused by 41 U.S.C. § 612(c) of the Contract Disputes Act.

26. The formula the parties agree to for calculating damages—A x B x C plus interest on that product—is a fair, reasonable and adequate way to calculate damages in this case. Those variables have been defined by the parties as follows: A = the total indirect cost pools for the settlement years; B = the percentage of A fairly attributable to other federal agency programs; and C = the percentage of B not recovered from those agencies. There is significant room for argument as to the variables involved in reasonably calculating damages on the claim at issue in this case.

27. The settlement amount represents two-thirds of Class Counsel's reasonable estimate of provable damages in this case for the settlement years at issue.

28. Paragraph 12 of the Settlement Agreement permits Class members to use their shares of the Common Fund for any allowed ISDA purpose including past, present or future allowed costs. Past allowed costs include loans or advances from tribal assets and other sources employed by Class members for ISDA purposes for which repayment was not received from the BIA or other federal agencies. This is a fair, reasonable, and adequate outcome for the Class as a whole despite the Bois Forte Band's allegations to the contrary.

29. Under OMB Circular A-87 and related documents each Class member had the right to propose an indirect cost pool which included its incremental costs for external consultants such as CPAs and attorneys needed to assist it in trying (short of litigation) to persuade or force the BIA to pay 100% of indirect cost needs. Thus, each Class member's incremental costs in the absence of evidence to the contrary can be assumed to have included such costs. Therefore the settlement amount, which was based on the "A" factor (the sum total of indirect cost pools for the Class in each settlement year), presumptively included such incremental costs.

30. The judgment amount of $76,200,000, plus interest from June 30, 1998, until paid, is a reasonable, adequate, and fair amount considering the nature of the claims and the risks of further litigation.

31. Those risks include the risk of indeterminate delay, decertification of the Class, further appeals, and attendant risk of modification of the law of the case, and risk to the Class that judgment after trial might be less than obtained in this Settlement.

32. Trial on damages, were this Settlement not approved, would be arduous, lengthy, uncertain, and complicated. Among the issues to be resolved would be measures of damage, off-sets, and collection and interpretation of voluminous data. Class Counsel estimate the costs of expert witnesses alone for such an exercise to run well into six figures.

33. Many Class members are in urgent need of their settlement shares.

34. There has been no collusion among counsel for either party.

35. The Objectors total 15 tribal Class members out of a putative Class to whom notices were sent of 825.

36. This small number of Objectors provides some additional indication of the fairness of the Settlement, however, this factor was not a significant indicia of reliability for the Court in its analysis of the Partial Settlement Agreement. As the Objectors point out, there may be a variety of other reasons for the limited number of filed objections, although the vast majority of the members of the Class are represented by competent, well informed counsel. The Court has taken its role as fiduciary seriously and has carefully reviewed all of the available material prior to reaching its conclusions.

37. The Court finds that counsel on both sides are seasoned, experienced and capable lawyers whose recommendation of approval is to be given great weight.

38. Several lawyers for Class members as well as the mediators have praised the Settlement, and their comments are also to be given weight.

39. As discussed above, the objections to the Settlement are unfounded and the burden of proof required to substantiate them has not been met:

    A. The uses of the settlement payments are not unreasonably restricted;

    B. The settlement amount is reasonable, fair and adequate;

    C. The separate settlement for RNC, given its valuable contribution to this litigation on behalf of the Class is justified;

    D. The earmarked contract to NCAI for a study of contract support issues is justified and reasonable, given its valuable contributions to this Settlement and to resolution of the equitable issues which are still pending.

    E. The release adequately protects the claims, rights and interests of non-Class member Indian tribes and entities whose cognizant agency is not the Department of the Interior.

F. The Judgment Fund payback issue is:

    1. Speculative and hypothetical, and therefore unripe for judicial resolution;

    2. Would arise if there were a judgment for the Class after trial and is therefore immaterial to the issue whether the Court should approve the Settlement;

    3. Implausible, strained, and unlikely to result (even if litigated in the future) in any dire consequences to the Class as predicted by the Objectors;

    4. A matter which would remain under the jurisdiction of this Court should the Objectors' predictions come to pass.

G. One objector's fears of retaliation by Congress against Class members because of their settlement in this case are unsupported and unwarranted. Congress has increased funding for Fiscal Year 1999, for contract support for both the IHS and the BIA and there is no evidence of any intent on the part of Congress to cut tribal programs, especially not as a result of this case.

40. The advantages of this Settlement for the Class outweigh any risks arising from 41 U.S.C. § 612(c) or any other alleged concern about Defendants' future retaliatory motives or efforts. The Court will presume that the Defendants, as trustee of this Class and other Indians, will act honorably, legally, and in keeping with their fiduciary responsibilities. If they do not, the Court has the power to correct their errors.

41. The issues, were they to go to trial, are complex, there would be great expense and judicial resources involved in resolving them, there would be substantial delay in the final resolution of this controversy, and there is significant risk of an outcome adverse to the Class or not as favorable as the settlement on which the Court's decision is based.

42. The reaction of the Class has been favorable as judged by the fact that 98% or more of the putative Class members including opt-outs now seeking reentry, all of whom received notice, failed to object or express any criticism of the Settlement. Four recognized opt-out tribes, the Navajo Nation, White Mountain Apache Tribe, Confederated Tribes of Siletz, and Eastern Shoshone Tribe, have petitioned for re-entry into the Class. None has expressed any objection to the Settlement. The Navajo Nation was the single largest putative Class member before it opted-out of the Class in 1994. It is estimated to have a claim worth approximately one-tenth that of all the other Class members' claims put together. It is understood that none of the opt-outs will share in the Settlement now before the Court. Any recovery they achieve will be paid by Defendants as additional amounts over and above the settlement amount stated in the Partial Settlement Agreement.

43. Plaintiffs' Counsel have conducted informal discovery, have been deeply involved in this narrow and complex area of the law for many years, and are well versed as to the issues involved in the negotiations.

44. The damages questions on remand from the Tenth Circuit are complex, subject to differing, reasonable interpretations and therefore not amenable to simple or quick resolution.

45. While the Defendants, the United States and its agencies, have virtually unlimited resources to pay a judgment after trial, they also have unlimited resources to prolong litigation. Such delay, if this Settlement were not approved, would work to the decided disadvantage of the Class.

46. The judgment amount of $76,200,000 plus interest from June 30, 1998, until paid, is within the range of reasonableness which the context and the facts adduced require.

47. The plan of distribution outlined in Appendix D to the Partial Settlement Agreement is fair and reasonable. It tracks the legal theory pursued by the Plaintiffs. At the same time it allows

for flexible approaches upon notice to the Class and Court approval should there be a need to modify it.

48. The redefinition of the Class to conform its membership with the theory on which this case was pursued and the settlement proceeds distributed is fair and reasonable. (*See* PSA ¶ 1(b).) It protects the interests of those original members of the Class who will not share in the proceeds of the settlement because their cognizant agency was not the Department of the Interior, since they were not injured by the Defendants in the single cause of action on which relief was obtained. Their claims, if any, against other agencies are preserved, not released, and not settled. Nor will they be subject to *res judicata* as a result of the judgment approving this Settlement.

49. The release is limited as to a specific time period and in the claims released. The reservation of all claims arising after the close of Fiscal Year 1993, and the reservation of all shortfall claims, except for the single cause of action defined at paragraph 3(a)(i) of the Partial Settlement Agreement in the settlement years, is a significant benefit to the Class.

50. The Partial Settlement Agreement as a whole is fair, reasonable, and adequate.

51. Class Counsel, Michael P. Gross (Law Offices of Michael P. Gross), and his co-counsel, C. Bryant Rogers (Roth, VanAmberg, Rogers, Ortiz, Fairbanks & Yepa, LLP) and Steven L. Tucker (Tucker Law Firm, PC), have been the attorneys representing the named Plaintiff, Ramah Navajo Chapter, and the Class in this action. Collectively these attorneys will be referred to herein as Class Counsel.

52. Class Counsel have applied for an award of attorneys' fees in the amount of $9,475,000, which is 12.5% of the Gross Common Fund, plus interest as set forth in ¶2(c) of the Partial Settlement Agreement, plus gross receipts tax. Class Counsel have also applied for the

reimbursement of costs in the sum of $162,689.82 plus a supplemental amount of $7,346.55 for a total of $170,036.37 exclusive of costs associated with the attorneys' fee application.

**Time and Labor Required**

53. The services rendered by Class Counsel are reflected in their affidavits which have been filed in this action. As of September 30, 1998, Class Counsel had expended approximately 3,245 hours in the case, excluding time spent on the fee application. Given the time period covered by the case, the complex nature of the issues, the difficulty of the settlement negotiations, and the quality of opposing counsel, the number of hours reflects remarkable efficiency.

54. Class Counsel seeks no additional fees for services rendered after September 30, 1998, which will or may become necessary as a result of this Settlement, including but not limited to the following:

  A. Legal services, if any, to be rendered on an appeal;

  B. Legal services to be rendered in connection with the distribution process;

  C. Legal services, if any, to be rendered in defending the Class's interest as to the Judgment Fund issue if it should arise; and

  D. Legal services to be rendered working with the federal and Intertribal Task Force for systemic reforms of the indirect cost system.

55. The future legal services referred to paragraph 54 cannot be accurately estimated at this time. However, the Court will note that as a result of the manner in which the Settlement Agreement is structured, all appellate issues will be resolved before Class Counsel receives any portion of the fee award and before the Judgment Amount is paid. (*See* PSA ¶¶ 2(d), 10(d).) Moreover, Class Counsel will only receive half of their fee award prior to the completion of the distribution of the Judgment

Fund, the second half is to be placed in a separate interest bearing account until the distribution is complete and application for its release is approved by the Court.  (*See* PSA ¶ 10(d).)       56.  In response to concerns raised by the Court, Class Counsel have explicitly bound themselves to preform the other legal work remaining after the distribution to the Class is complete, including any representation required to resolve the Judgment Fund issue and legal services related to the Intertribal Task Force's work towards systemic reform.  (*See* Stipulation of the Parties (Docket No. 283), filed May 13, 1999.)  The Court will defer distribution of a portion of the second fees payment, if it deems such action to be necessary to guarantee completion of any remaining legal representation after distribution to the Class is complete.  Such deferral is particularly likely should the Judgment Fund issue remain unresolved.  The Court notes that although the services related to systemic reform will be difficult to verify, they are a valuable and unselfish commitment by Counsel.  While relatively insignificant to the settlement of these claims, these services may greatly improve the possibility of a political resolution of the fundamental problems in the provision of indirect costs under the Indian Self-Determination Act.  The Court has faith in the long-term commitment of Class Counsel to the equitable resolution of these issues, however, the Court will nonetheless consider reservation of a portion of the fees awarded pending completion of these services as well, should that be deemed necessary.

57.  The Court incorporates by reference the Stipulation of the Parties regarding the application for and distribution of attorney's fees (Docket No. 283), filed May 13, 1999.

**Novelty and Difficulty of Questions Presented**

58.  The issues here revolved around (a) the origin, nature, and purpose of the Indian Self-Determination and Education Assistance Act, 25 U.S.C. §§ 450 *et seq.*, and (b) numerous regulations

and practices of the Department of Interior, over a long period of time and with respect to virtually all the Indian tribes and organizations, in administering that Act, specifically with regard to accounting procedures and funding for tribal programs under the Act. The issues were "novel," as shown by the lack of any precedent directly in point. They were complex inasmuch as they required a thorough understanding of both legal and accounting issues involving hundreds of different tribal organizations and the arcane methodologies used by the BIA in analyzing indirect costs. They were difficult as shown by the position taken by the Defendants and ruling of this Court which were ultimately rejected by the Tenth Circuit Court of Appeals. Class Counsel created the legal theory which prevailed in this case and resulted in this remarkable Partial Settlement.

**Amount Involved and Results Obtained**

59. The gross Common Fund of $75,800,000 for the Class's claims for the years FY 1989 through FY 1993 is an outstanding and exceptional result in favor of the Class. This is one of the largest class action common recoveries in this Circuit and the average share of this gross figure (before deductions for fees, costs, etc.) for every putative Class member sent notice is approximately $90,000. The result is particularly remarkable given the high degree of risk involved on the merits of the question presented and the difficulty of the negotiations involved in the settlement with the Defendants. The most striking aspect of the settlement is that the Partial Settlement Agreement releases only the single cause of action presented as defined in paragraph 3(a)(i) for the period FY 1989 though FY 1993. All other claims are reserved, not settled or released and will be pursued by the Class, presumably resulting in further awards. One would have thought that such a large settlement would have required complete resolution of all issues, however, Class Counsel have preserved many of the Class' claims for future resolution. Such a result is truly phenomenal. Finally,

the Court notes that the Settlement contains significant concessions or obligations on the part of the Defendants with respect to the so-called Judgment Fund issue.

60.   This Settlement represents vindication of important public policies of the United States in terms of its on-going fiduciary responsibilities and commitments to Native Americans and the recognized tribes to which they belong.

**Preclusion of Other Employment**

61.   Undertaking the representation of virtually every Indian tribe in the United States, as well as other related entities, in a class action suit against the United States Government required a significant commitment of time on the part of Class Counsel.  Class Counsel were either solo practitioners or in a relatively small law firm during the entire history of this case.  Lead Counsel Michael P. Gross, in particular, had to devote substantial blocks of time to this case which, at various times during the litigation, seriously curtailed his ability to take on other, paying work.  All Class Counsel were required to remain ready to make a full commitment to this case as needed.

62.   Class Counsels' required focus and the Class representative's lack of resources forced them to find alternative sources of funding, including personal loans and the refinancing of their own residences.  The Court recognizes, as the Objectors have observed, that Class Counsel have spent approximately 3,300 hours over an eight year period on this case, the vast majority of which was spent after the Tenth Circuit's ruling.  While this litigation resulted in a significant investment of time and resources by Class Counsel,  it cannot be viewed as a serious preclusion of all other employment except, perhaps, during the period of intensive negotiations after the Tenth Circuit's decision.

**The Customary Fee and Awards in Similar Cases**

63. The customary fee in a case such as this, outside the context of a class action, is the contingent fee arrangement where counsel receives a percentage, usually 33a percent of the recovery, if there is any, and no fee if there is no recovery. In the class action context, the customary fee is established by the common fund doctrine and as discussed above. In the Tenth Circuit, the percentage method is the preferred method for establishing the fee. For these reasons, the Court has adopted this method of determining a reasonable fee because it most closely approximates the manner in which the marketplace would value the services provided. In the contingency fee context the marketplace would value the services by the results obtained, not by the hours required to achieve them. Therefore, the lodestar analysis proposed by the Objectors—either as the primary means of setting the award or as a check on the reasonableness of a proposed percentage—would not provide an accurate gauge by which to judge the award.

64. Awards in common fund cases with similar damages in this Circuit include the fee of 16.5% of the $75 million recovery in *Brown v. Phillips Petroleum Co.,* 838 F.2d 451 (10th Cir. 1988); the fee of 14.04% of the $75 million recovery in *Brewer v. Southern Union Co.,* 607 F. Supp. 1511 (D. Colo. 1984); the fee of 27.80% of the $74 million recovery in *Feerer v. Amoco Production Co.,* Div. No. 95-0-012 JCC/WWD (D.N.M. 1998); and the fee of 13% of the $150 million recovery in *In re Copley Pharmaceutical, Inc.,* 1 F. Supp. 2d 1407 (D. Wyo. 1998). While these cases may have involved a more significant commitment of time by Class Counsel, do not contain precisely analogous facts, and in some cases rely in whole or in part on a lodestar analysis, the Court finds that they are useful in determining the reasonableness of the fee proposed by Class Counsel.

**Any Prearranged Fee**

65.    There was no prearranged fee with the Class.  Mr. Gross did have a prearranged fee agreement with the named representative, Ramah Navajo Chapter, whereby it would pay him at the rate of $65 per hour, which was (when this contract was signed in 1991) one-half of his hourly rate. Payment, however, was not to exceed a total of $50,000 of which $20,000 was to be for costs and expenses.  The limitations were later raised somewhat.  Through the date of filing of the Application for an award of attorneys' fees and costs, Class Counsel incurred out-of-pocket expenses of approximately $162,000 and had received payments under the contract with RNC of approximately $100,000.  The contract between RNC and Mr. Gross contemplated that, if this were certified as a class action and in the event of the recovery of a Common Fund, he would seek the recovery of an attorneys' fee of not less than 10% from the Common Fund.  In the event of such recovery, Mr. Gross agreed to reimburse RNC for the payments it had made under the contract.  Should Class Counsel have not succeeded in achieving this Settlement, they would have recovered no fees for their work and may have remained unreimbursed for the additional $62,000 in incurred costs.

**Time Limitations Imposed by the Client or the Circumstances**

66.    Certain time limitations were imposed by the circumstances.  Plaintiffs claimed, and the Tenth Circuit agreed, that the Defendants failed to fund Indian Self-Determination contracts at the rate and in the manner required by Congress.  This funding is critical to the continuation, vitality, and effectiveness of these contracts and to the Indian self-determination policy of the Congress.  The members of the Class possessed few, and in some cases no, alternative sources to make up this underfunding.  This circumstance created and still creates a need to have this matter quickly resolved and to have the funds distributed to the Class.  Despite this urgency, as a result of this Court's busy

docket and the length of the appeal, prior to the Tenth Circuit's reversal, there was little Counsel could do to resolve this matter promptly. After the appeal, however, Counsel acted admirably to bring this complex issue to a prompt, albeit partial, resolution.

**The Experience, Reputation, and Ability of the Attorneys**.

67. Mr. Gross and Mr. Rogers are highly experienced with more than 45 years of Indian law experience between them, have excellent reputations, and are very able as attorneys in Indian law generally and in the indirect cost issues which gave rise to this case in particular. A limited number of attorneys in the United States share their level of expertise and accomplishment in this area. Mr. Tucker has an excellent reputation in appellate practice, and his skills at legal research, drafting, and writing have been of great service to the Class.

**The Undesirability of the Case.**

68. In this case the difficulty of calculating damages was a major negative factor to any lawyer who might have contemplated taking this case on a pure contingent fee basis—or even with the very limited fee arrangement Mr. Gross had with RNC—because of the risk of decertification and the complexity and obscurity of the issues presented. This is a very significant factor in the Court's analysis. Without the dedication and skill Class Counsel has exhibited throughout this litigation, it is doubtful that this matter would have been litigated, let alone resolved in such an exceptional manner.

**The Nature and Length of the Professional Relationship with the Client.**

69. Lead Counsel for the Class, Michael P. Gross, has a long-standing and strong professional relationship with the named Plaintiff, Ramah Navajo Chapter, commencing in 1968. (*See* Aff. Michael P. Gross.) This professional relationship and commitment to the client's long-term

welfare were instrumental in his decision to undertake this extraordinary case. Co-counsel, C. Bryant Rogers, also has a 17 year history of providing legal services to the Ramah Navajo community. While commendable, these long term relationships do not particularly support or diminish the fee request. This factor would have been more significant if Counsel were unrelated to the named Plaintiff and took this difficult case without any previous relationship to any of the members of the Class.

**Objections by the Class**

70.   Of the 825 putative Class members who were sent notice of the hearing on the approval of the Partial Settlement Agreement and the Application by Class Counsel for an Award of Attorneys' Fees and Costs, only fifteen objections were received. Given the relatively large amount which the average Class member is expected to receive and that most Class members have independent counsel, the fact that 98% of those who received notice did not object either to the approval of the Partial Settlement Agreement or to the application for fees and costs is not insignificant. It is also significant that the Defendants, including the United States which is trustee for the Class, did not object to the fee application.

71.   The Court has considered all the objections which have been filed with the Court or raised at the hearing and has generally found the objections to be without evidentiary basis or otherwise without merit. While the Court has rejected the Objectors' proposed lodestar methodology for determining a fee or as a check on the reasonableness of a percentage award, the Court takes seriously the Objectors' concern about the size of the proposed percentage. It will not, however, adopt the Objectors' unreasonably low proposed percentage of 2.5% of the Common Fund.

**Reasonableness of Fee Request**

72. Applying the percentage-of-the-fund method of calculating attorneys' fees in this case, and in consideration of the all the facts of this case including those recited in these Findings of Fact, the Court finds that the requested fee of 12.5% of the Gross Common Fund (including pre- and post judgment interest) plus gross receipts tax should be reduced to 11% of the Gross Common Fund (including *only* post-judgment interest) plus gross receipts tax. This results in an award of $8,338,000 plus 11% of the post-judgment interest on the Gross Common Fund and New Mexico gross receipts tax on those fees. The Partial Settlement Agreement provides that gross receipts tax on the fee is an allowable cost and the Court will not disturb this arrangement. (*See* PSA ¶ 10(a).)

73. The Court does not intend to impugn the integrity of Class Counsel by reducing the award, nor does it intend to punish Counsel for approaching their fee request in such a reasonable manner. However, it is the Court's judgment that 11% of the Gross Common Fund less pre-judgment interest is a more reasonable award in light of all of the circumstances and the Court's own application of the *Johnson* factors. The Court finds that this award is justified in light of each of its findings above, particularly the difficulty and novelty of the issues litigated, the remarkable result achieved in the Partial Settlement Agreement, the reservation of numerous claims potentially permitting further recovery by the Class, the skill and devotion of Class Counsel, and the undesirability of the cause prior to the Tenth Circuit's decision. For the reasons discussed above, the Court finds that a lodestar analysis would not assist it in determining the reasonableness of this award. The marketplace would not determine the value of these services by the number of hours worked, and neither will the Court.

74. Although the award represents a significant dollar amount, it is a relatively small percentage of the fund, compared to that awarded in similar cases in the Circuit. The Court finds, however, that it is large enough to encourage Class representation of tribal entities in the future, while at the same time not so large as to negatively impact the individual Class member's award. *See* HIRSCH & SHEEHEY, AWARDING ATTORNEYS' FEES AND MANAGING FEE LITIGATION at 65-66. The Court commends Counsel on their conservative approach in their fee application and their obvious concern for the fiscal constraints of the tribes they represent.

**Requested Reimbursement of Costs**

75. Class Counsel has also submitted a detailed application for reimbursement of costs incurred in the course of representing the Class which sets forth the type and amount of costs incurred in this action. The total amount of such costs is $170,036.37. No objection was made to the request for reimbursement of costs. The Court finds that these costs were reasonably and necessarily incurred and that the reimbursement of such costs, out of the Gross Common Fund, in addition to the award of attorneys' fees, is reasonable and shall be made at the time the first payment of Counsel's fee is made.

76. It would be unfair to delay reimbursement of costs until the final conclusion of the case.

77. Many of the Class members would not qualify for an EAJA award of attorneys' fees under 28 U.S.C. §2412.

CONCLUSIONS OF LAW

1. The Court has jurisdiction over this matter pursuant to 25 U.S.C. § 450m-1 and the mandate of the Court of Appeals for the Tenth Circuit.

2. The Partial Settlement Agreement of August 31, 1998, is fair, reasonable, and adequate and will be approved.

3. The majority of the objections are not well founded:

    A. Paragraph 12 of the Agreement permits use of settlement proceeds by Class members allowable under Section 102 of ISDA for all allowable past, present, and future ISDA costs.

    B. The separate settlement for the Ramah Navajo Chapter is fair, reasonable, and equitable and is therefore justified.

    C. The payment of $250,000 to NCAI for continuing studies of the contract support and indirect cost system under ISDA is fair, reasonable, and equitable and will benefit the Class.

    D. The size of the Partial Settlement is fair, reasonable, and adequate and within the range of reasonableness given the context.

    E. The Agreement adequately protects the rights and interests of non-Class member Indian tribes and organizations.

    F. The objections to the proposed attorneys' fee award are not valid with the exception of the concern about the total percentage of the Common Fund to be awarded, as discussed above.

4. The named representative and Class Counsel were under no legal duty to join other Defendants or pursue other legal theories or causes of action besides the single cause of action they pursued.

5. The Settlement is a fair, reasonable, and beneficial outcome for the Class.

6. The Partial Settlement Agreement meets the criteria set forth in Federal Rule of Civil Procedure 23(e).

7.    Attorneys who represent a Class and, through their efforts, create a common fund are entitled to compensation for their services from that fund to avoid unjust enrichment by the members of the Class.  *See Boeing Co. v. Van Gemert,* 444 U.S. 472, 478 (1980); *Gottlieb v. Barry,* 43 F.3d 474, 482 (10th Cir. 1994); *Brown,* 838 F2d. at 454.

8.    In determining reasonable attorneys' fees in common fund cases, the Tenth Circuit has expressed a "preference" for the "percentage-of-the-fund" method over the "lodestar" method.  *See e.g., Gottlieb,* 43 F.3d at 483 (citing *Uselton v. Commercial Lovelace Motor Freight, Inc.,* 9 F.3d 49 (9th Cir. 1993)); *see also, Rosenbaum v. MacAllister,* 64 F.3d 1439, 1445 (10th Cir. 1995) ("[w]e have recently implied 'a preference for the percentage of the fund method' in common fund cases") (citations omitted).  This Court has recently recognized this preference.  *See In re Horizon/CMS Healthcare Corp. Sec. Litig.,* 3 F. Supp. 1208, 1211 (D.N.M. 1998) ("[t]he Court recognized the Tenth Circuit Court of Appeals has expressed a general preference for awarding attorneys' fees through the percentage method").

9.    The Supreme Court has recognized that in common fund actions "a reasonable fee is based on a percentage of the fund bestowed on the class" distinguishing fees calculated under 42 U.S.C. § 1988 which are based on time spent.  *See Blum v. Stenson,* 465 U.S. 886, 900 n. 16 (1984).

10.    In 1985, the Third Circuit Task Force which studied this issue recommended that in common fund cases fees should be based on the percentage-of-the-fund method and not the lodestar method, finding at least nine specific criticisms with using the lodestar method in common fund cases. 108 F.R.D. 237.

11.    The lodestar method is difficult to apply, time-consuming to administer, inconsistent in result, and capable of manipulation to reach a predetermined result.  Accordingly, it has been

criticized by courts, commentators, and members of the bar.  In recent years, the trend has been toward the percentage of the fund method.  MANUAL FOR COMPLEX LITIGATION (West 1995) §24.121, p. 189.  In addition, the Class would not qualify for attorneys' fees under the Equal Access to Justice Act, 28 U.S.C. §2412.

12.   The percentage-of-the-fund method:

A.   Most closely approaches the methodology actually employed in the market place for services in a case of this nature;

B.   Because it matches the marketplace, it provides incentive for counsel to pursue actions of this nature on behalf of large groups;

C.   Is less subjective than the lodestar plus multiplier approach;

D.   Properly gives primary consideration to the result achieved, which was the goal of attorney and client, rather than to time-spent;

E.   Encourages and rewards efficiency on the part of counsel and does not reward counsel for spending more time than necessary, duplicating services, and delaying the recovery for the Class;

F.   Most closely approximates the agreement between Class Counsel and RNC;

G.   Was recommended by experts called on behalf of the application.

13.   The Court concludes that fees should be calculated according to the percentage-of-the-fund method.

14.   Under the percentage-of-the-fund method, an appropriate starting point is the 25% benchmark established by the case law, with adjustments to be made up or down based on the factors articulated in *Johnson v. Georgia Highway Express, Inc.,* 488 F.2d 714 (5th Cir. 1974).  *Gottlieb,*

43 F.3d at 482-83, 88; *Brown,* at 454-55. *See also,* MANUAL FOR COMPLEX LITIGATION, at §12.121, p. 189.

15.    The Court has taken into account the *Johnson* factors.  In this case, a reasonable fee is derived by giving greater weight to the results obtained, the novelty and difficulty of the issues and the skill of counsel than to the time spent.  At the outset, the recovery of any money was highly uncertain and contingent.  The issue of liability was an issue of first impression and, as reflected by the Court's earlier ruling in favor of the Defendants, was one on which it did not appear to this Court that Plaintiffs could prevail.  The reversal by the Tenth Circuit does not alter the fact that the issue was a difficult and novel one for the Plaintiffs, taken at great risk, which was managed very skillfully by Class Counsel.  The Defendants were represented by excellent attorneys and had the resources of the federal government at hand, far in excess of the resources of Class Counsel.

16.    The outstanding result would not have been achieved without the commendable effort of Class Counsel, for which they should be paid a reasonable percentage of the Gross Common Fund. The Court concludes, for the reasons discussed above, that a fee of 11% of the Gross Common Fund of $75,800,000 (plus post-judgment interest) and an award of New Mexico gross receipts tax on those fees, is reasonable.  The Court therefore awards 11% of the Gross Common Fund (including only post and not pre-judgment interest), or  $8,338,000 plus 11% of the post-judgment interest on the Common Fund, in attorneys' fees to Class Counsel.  The Court also awards New Mexico gross receipts tax on those fees.  These awards are to be paid out of the Gross Common Fund in the manner described above.

17.    The Court finds that the requested sum of $170,036.37 as costs is appropriate, legally authorized, and  reasonable and shall be awarded in addition to the attorneys' fee.  The amount of

costs is far below that in many other cases with a comparable recovery and reflects the efficiency with which this case was managed by Class Counsel.

18.    The award of attorneys' fees and costs shall be paid as provided in Section 10.d of the Partial Settlement Agreement.

The Court enters an Order and Partial Final Judgment under Rule 54(b), executing these Findings of Fact and Conclusions of Law, contemporaneously with this Memorandum Opinion.

**UNITED STATES DISTRICT JUDGE**