## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF NEW MEXICO

**RAMAH NAVAJO CHAPTER**,
**OGLALA SIOUX TRIBE**, and **PUEBLO
OF ZUNI**, for themselves and on behalf
of a class of persons similarly situated,

      Plaintiffs,

vs.                              No. CIV 90-0957 LH/WWD **ACE**

**GALE NORTON**, Secretary of the
Interior, in her official capacity,
**UNITED STATES DEPARTMENT OF
INTERIOR, NEIL McCALEB**, Assistant
Secretary of Interior for Indian Affairs,
in his official capacity, **EARL DEVANEY**,
Inspector General, in his official capacity,
and **UNITED STATES OF AMERICA,**

      Defendants.

## FINDINGS OF FACT AND CONCLUSIONS
## OF LAW APPROVING SECOND PARTIAL
## SETTLEMENT AGREEMENT, AND AWARDING
## ATTORNEY'S FEES AND COSTS

**THIS MATTER COMES** before the Court on the parties' Joint Motion for Preliminary and

Final Approval of Second Partial Settlement Agreement and Order that Notice be Sent to the Class

(Docket No. 678), filed September 9, 2002, and the Application of Class Counsel for an Award of

Attorney's Fees and Costs (Docket 688) filed September 30, 2002.  Having considered the relevant

pleadings, the arguments of counsel, the absence of any objections either to the proposed second

partial settlement agreement or to the application for an award of attorney's fees and costs, and the

applicable law, the Court finds that the Second Partial Settlement Agreement is in the best interest

of the class and will be approved, and that the Application for Attorney's Fees is well-taken and will

be granted.

**BACKGROUND**

This matter was originally filed in this Court in 1990. The named class representative, the

Ramah Navajo Chapter of the Navajo Nation (RNC), and the Class were seeking reimbursement for

unpaid indirect costs incurred while providing services under Indian Self-Determination Act contracts.

The Plaintiffs alleged that the formula the Bureau of Indian Affairs used to calculate these indirect

costs resulted in serious underpayments which the tribal entities had to absorb in their already

strapped budgets. As to this claim, "the calculation claim," this Court granted summary judgment

in favor of the Defendants, finding that the BIA formula conformed to the applicable statutes. This

holding was reversed by the Tenth Circuit. *Ramah Navajo Chapter v. Lujan,* 112 F.3d 1455 (10th

Cir. 1997). Thereafter, the parties entered into a Partial Settlement Agreement (First PSA) proposing

to settle the claim for money damages arising under the calculation claim for fiscal years 1989 through

1993. Claims after FY 1993 were not released. Notice was sent to the class, and some class

members objected to the fairness of the settlement agreement or to the application for an award of

attorney's fees and costs, or both. After a hearing, this Court approved the First PSA and granted,

in part, the Application for an Award of Attorney's Fees and Costs associated with that settlement.

*Ramah Navajo Chapter v. Babbitt,* 50 F.Supp. 2d 1091 (D.N.M. 1999) (*Ramah I*). No one appealed

that ruling.

Thereafter, Plaintiffs added two additional claims, namely, "the Shortfall claim" and the direct

contract support costs or "DCSC claim." The Shortfall claim represents a claim for the difference

between the indirect cost rate multiplied by the BIA direct base for all class members (as set by the

2

previously-used methodology, declared unlawful by the Tenth Circuit, for calculating indirect costs rates) and what was actually paid.  The DCSC claim filed as a separate case by the Pueblo of Zuni, *Pueblo of Zuni v. United States*, D.N.M. No. CIV 01-1046 LH, represents a claim for  unpaid direct contract support costs under 25 U.S.C. §450j-1(a)(2), (3), and (5) and represents contract support costs that are neither included in the indirect cost pool nor in the Secretarial amount portion of a self-determination contract.

Under the Second Partial Settlement Agreement (Second PSA), the parties propose to settle these two new claims, the Shortfall claim and the DCSC claim, for the so-called "lump sum years" which occurred before Congress limited the appropriations for contract support costs through "cap" language ("not to exceed") in each annual appropriations Act.  The parties are settling the Shortfall claim for FY 1992 and 1993, and the DCSC claim for FY 1993 and 1994.  Shortfall claims after FY 1993 and DCSC claims after FY 1994 are not released.

On September 9, 2002, the parties filed a Joint Motion for Preliminary Approval and Final Approval of Second Partial Settlement Agreement and for Order Authorizing Class Notice.  Also on September 9, 2002, the Court heard the motion for preliminary approval and entered an Order Granting Preliminary Approval of Second Partial Settlement Agreement and Directing Notice to the Class, setting the joint motion for hearing on December 5, 2002.  Notice was sent to the class on or before October 8, 2002.  The deadline for filing objections to the proposed Second PSA or to the Application for Attorneys Fees and Costs was November 8, 2002.  No objections were filed either to the Second PSA or to the application.

On December 5, 2002, the Court held a hearing on the approval of the Second PSA and the Application for an Award of Attorney's Fees and Costs.   The Court has carefully considered the

arguments presented at the hearing and all documents filed in support of the approval of the Second

PSA and the Application for Award of Attorney's Fees and Costs.

In regard to the Application for Award of Attorneys fees and Costs, in *Ramah I,* at 1095-97,

the Court determined that in this circuit, "the recent trend has been toward utilizing the percentage

method in common fund cases," *citing Gottlieb v. Barry,* 43 F.3d 474, 482 (10th Cir. 1994).  The

Court also noted that "courts do not blithely grant the percentage requested by prevailing counsel,"

and that "[m]ost courts select a percentage in the 20% to 30% range, and that the Ninth Circuit has

indicated that 25% is the 'benchmark' award." *Id.* at 1096.  The Court noted that the Tenth Circuit

has directed that in determining what percentage would be reasonable, courts should review the

twelve factors articulated by the Fifth Circuit in *Johnson v. Georgia Highway Express, Inc.,* 488 F.2d

714, 717-19 (5th Cir. 1974).  The *Johnson* factors are:

> (1) the time and labor involved; (2) the novelty and difficulty of the
> questions; (3) the skill requisite to perform the legal service properly;
> (4) the preclusion of other employment by the attorney due to
> acceptance of the case; (5) the customary fee; (6) any prearranged fee
> – this is helpful but not determinative; (7) time limitations imposed by
> the client or the circumstances; (8) the amount involved and the
> results obtained; (9) the experience, reputation, and ability of the
> attorneys; (10) the undesirability of the case; (11) the nature and
> length of the professional relationship with the client; and (12) awards
> in similar cases.

*Ramah I* at 1096.

The Court further noted that these factors do not necessarily have equal weight and that,  in

this case, the time and labor involved is to be given less weight and:

> the other *Johnson* factors – most significantly the novelty and
> difficulty of the questions, the skill required, and the custom of
> contingency fee arrangements in similar cases – would help the Court

4

more accurately determine a reasonable percentage of the fund to
award in attorneys' fees.

*Id.* at 1097.

FINDINGS OF FACT

1.      The Findings of Fact and Conclusions of Law contained in the Court's Memorandum

Opinion and Order approving the First PSA, *Ramah I* at 1097-1109, are incorporated herein by

reference.

2.      Following the approval of the First PSA, the Shortfall claim was added as a class claim

to the instant case in September 1999, by a motion to intervene filed by the Oglala Sioux Tribe and

a motion to amend by the Ramah Navajo Chapter.   The government filed and later withdrew

objections to the motion and ultimately consented to the motion to intervene and amendment of the

complaint.

3.      In the spring of 1999, the Pueblo of Zuni began inquiring into the facts which

ultimately gave rise to the DCSC claim.

4.      In the fall of 1999, the parties began discussing a settlement of all outstanding contract

support cost claims against the Interior Department.

5.      In March 2000, the Pueblo of Zuni filed a class action in this Court asserting the

DCSC claim for FY 1993 forward.   *Pueblo of Zuni v. United States*, D.N.M. No. CIV 01-1046 LH.

Ultimately, counsel for the Pueblo of Zuni, Lloyd D. Miller and his firm, entered into a joint

prosecution agreement with Class Counsel in the *Ramah* case to prosecute both cases together.

6.      The parties took sharply divergent positions as to liability and damages on the DCSC

claim and the Shortfall claim.

5

7.     In the spring of 2000, formal negotiations between the parties on these claims began with two meetings in Washington, DC, on March 27 and June 22, and several telephone conferences and exchanges of position papers.

8.     During the initial sessions, the Judgment Fund issue reappeared (*see, Ramah I* at 1095).   Ultimately, the parties agreed to deal with the Judgment Fund issue in the same manner as they did under the First PSA, and negotiations continued.

9.     During the early negotiations, the government advised that it wanted the settlement negotiations to encompass all three claims for all remaining years, i.e., the remaining calculation claims, the Shortfall claim, and the DCSC claim. In addition, as to the DCSC claim, the government required a statistically valid sampling of all self-determination contractors having contracts with the BIA, such sampling to consist of data from at least 51 tribes randomly selected by the government. Class Counsel and Co-Counsel, particularly Mr. Miller, developed and promulgated the survey required by the government.  That work consumed the summer and fall of 2000.  Despite every effort by Plaintiffs' counsel to meet the government's requirements, only 20 of the 51 tribes returned completed survey forms.  The Class supplemented these responses with data from 10 additional tribes.  Although not statistically valid, the survey results assisted the parties in reaching settlement of the DCSC claim.

10.     During 2000, the parties agreed to try to engage a mediator to facilitate the negotiations.  Everyone's first choice was Senator George Mitchell.  Ultimately Senator Mitchell was engaged as the mediator.

11.     Between November 2000 and June 2001, Senator Mitchell conducted four mediation sessions: three in Washington, D.C., and the last one in Los Angeles, California.

12.     At the last session, June 21-22, 2001, the government removed from the table all claims except the Shortfall claim for FY 1992 and 1993, and the DCSC claim for FY 1993 and 1994. The government then provided a detailed response to the Shortfall and DCSC claims, together with supporting analysis. Ultimately, the government made a final offer of $29,000,000 for those claims. After intense consultation with named Plaintiffs' representatives, the representative from the National Congress of American Indians, and consultants both in person and by telephone conference, Class Counsel conditionally accepted the offer of $29,000,000, subject to Defendants' furnishing satisfactory proof that they had paid a portion of certain DCSC costs for FY 1993 and 1994 as part of the Secretarial funding amount. All other claims were specifically reserved for future litigation. Two documents were signed in Los Angeles embodying these understandings. (*See,* Attachment F to Affidavit of Class Counsel Michael P. Gross) Such information was ultimately furnished and deemed acceptable by Class Counsel, thus removing the conditional nature of the settlement.

13.     In Class Counsel's judgment, the proposed settlement of $29,000,000 represents approximately 60% of the maximum reasonably provable damages for the Class on these two claims for these settlement years, if the Class prevailed on all legal and factual issues.

14.     In the absence of a settlement, the trial of the issues would be difficult and risky for the class.

       a.     It is estimated that a trial on these issues would last between ten and thirty days;

       b.     Extensive additional discovery would be necessary covering many years of government and tribal records from all over the country;

7

c.     Class certification of the DCSC claims would be resisted by the government; and

d.     Decertification of the Shortfall claim is a possibility as is the possibility that the DCSC might not be certified as a class claim.

e.     There now exists a significant body of case law adverse to the position of the Class on these claims.

15.     The settlement was fair and reasonable to the Class when it was agreed upon in June of 2001 and has, if anything, become more advantageous with the passage of time.

a.     A number of decisions have been announced (some of which were decided after the agreement in principle was reached on the settlement on June 22, 2001), which are harmful to the Class' claims.  *See, e.g., Cherokee Nation and Shoshone-Paiute Tribes v. United States,* 190 F.Supp.2d 1248 (E.D. Okl. 2001) *aff'd*, ___ F.3d ___ (10th Cir. Nov. 26, 2002), Slip Opinion No. 01-7106; *Babbitt v. Oglala Sioux Tribal Public Safety Dept.,* 194 F.3d 1374 (Fed. Cir. 1999), *cert. denied,* 530 U.S. 1203 (2000); *Shoshone-Bannock v. Secretary of Dept. Health & Human Services,* 279 F.3d 660 (9th Cir. 2002)

b.     The documentation provided by the government before the the Los Angeles session began and after the conditional settlement in June of 2001 supported its position on a number of key factual issues that underlie the parties' differences with regard to the DCSC claim and Shortfall claim. For example, the documentation tended to show that funds covering a portion of employee fringe benefit costs for BIA employees had been included in the Secretarial funding level.  In addition, the government's documentation indicated that the pass-through percentage of funds excludable from the BIA funds comprising the direct cost bases used for the Class' IDC rate calculations for the

settlement years was larger than initially contended by Plaintiffs.   Finally, the government's documents tended to show that higher  indirect CSC amounts were actually paid by the Defendants for FY 1992 and 1993 than the Plaintiffs' initially contended.   All of these factors further highlighted the substantial legal and conceptual differences separating the parties as to the measure of damages for, and other definitional underpinnings of, the Shortfall claims and the DCSC claims, none of which has been resolved by binding judicial precedent.

16.   During the fourteen months between the conditional settlement reached in Los Angeles on June 21, 2001, and the filing date of  the proposed Second PSA, there were significant additional difficulties to overcome.

a.   As noted, the parties had to exchange and analyze factual information to remove the conditional nature of the settlement.

b.   The parties had difficulty agreeing on the exact terms of the settlement agreement; over 20 drafts of or amendments to the settlement agreement were prepared before agreement of a final draft was reached.

c.   The 2002 change of administration and the attendant change of personnel at various levels of the appropriate government agencies, significantly increased the difficulty of finalizing the settlement.

d.   Negotiations were further delayed by the events of 9-11.

e.   To secure finality for the government, the government initially insisted on retaining a post-approval right to withdraw from the settlement if even one tribe opted-out of the new DCSC claim. However, this was an unsatisfactory resolution for the Class.  Class Counsel overcame this problem by obtaining leave of the Court to add the DCSC as a new class claim in *Ramah* (and

consolidating the Zuni DCSC claims in the *Ramah* action) before finalizing the proposed settlement (while at the same time giving the Class notice that a settlement in the amount of $29 million was being sought), and publishing notice to the Class with a right to opt-out of the DCSC claim. Pleadings and orders carrying out this strategy were filed and approved by the Court on March 27, 2002. On May 10, 2002, the opt-out period for the DCSC claim passed without any tribe opting-out (a process which consumed several months). A portion of this problem nevertheless resurfaced in September 2002, with regard to the single tribe that had opted out of the Shortfall claim two years earlier. Class Counsel obtained a release from this single opt-out from the Shortfall claim which resolved all issues concerning this subject.

17.     The Second PSA reserves and does not release significant claims for the Class for the years after the lump sum years.

18.     As in the case of the single named plaintiff in the First PSA, the Ramah Navajo Chapter, all three named plaintiffs in this settlement deserve and are entitled to an incentive award, as set out in ¶¶ VI.A and VI.C.2.a of the Second PSA. This award will be 1.2 times the base share percentage calculated as are the share percentages of each absent class member under Appendix F of the Second PSA. This share percentage will then be multiplied by the settlement amount less the Reserve Fund ($500,000) and the NCAI Fund ($150,000). The named plaintiffs will also share in the residual distribution on the same basis as other class members.

19.     This Court approved the incentive award for the Ramah Chapter in the First PSA, which was stated as a lump sum and worked out to approximately a 33-1/3% increase over the amount it would have received as an unnamed class member. The incentive award to named plaintiffs in this Second PSA is an increase of approximately 20% over the share they would otherwise be

entitled to receive as unnamed class members, further enhanced by their exemption from sharing in the burden of attorneys' fees and costs.  Each of the three named plaintiffs contributed significantly to the outcome.  Each sent representatives to all negotiating sessions at their own costs and conferred frequently with counsel.  Each participated, through their financial managers and accountants, in developing the theories of recovery which produced this settlement.  Each shared extensive documentation of the claims with counsel.  Besides the authority represented by this Court's approval of the First PSA, additional cases support incentive awards.  These include *Lachance v. Harrington*, 965 F. Supp. 630 (E.D. Pa. 1997); *Cimarron Pipeline Constr., Inc. v. National Council on Compensation Ins.,* 1993-2 Trade Cases (CCH). §70,310 (W.D. Okla. June 8, 1993); *White v. National Football League,* 822 F. Supp. 1389 (D. Minn. 1993), *aff'd*, 41 F.3d 402 (8th Cir. 1994); and *Whitford v. First Nationwide Bank*, 147 FRD 135 (W.D. Ky. 1992).  *See generally,*  3 H. Newberg and A. Conte, NEWBERG ON CLASS ACTIONS, §11.38.

20.     The Second PSA was the result of years of hard-fought, extensive, arms-length negotiation by counsel for all parties.

21.     The Second PSA as a whole is fair, reasonable and adequate.

22.     Class Counsel, Michael P. Gross (M. P. Gross & Associates, P.C.) and his Co-counsel, C. Bryant Rogers (Roth, VanAmberg, Rogers, Ortiz, Fairbanks, & Yepa, LLP), Steven L. Tucker (Tucker Law Firm, P.C.), and Eric Treisman have been the attorneys representing named Plaintiff Ramah Navajo Chapter and, along with Marvin Amiotte, the named Plaintiff Oglala Sioux Tribe.  Class Co-Counsel Lloyd B. Miller (Sonosky, Chambers, Sachse, Endreson & Mielke of Albuquerque, NM) and William Perry (Sonosky, Chambers, Sachse, Endreson & Perry of Washington, DC) have been the attorneys representing the named Plaintiff Pueblo of Zuni.

11

Collectively all named counsel have been representing the interests of the Class under a joint prosecution agreement, and for purposes of this Memorandum Opinion and Order will be referred to as Class Counsel.

23.     Class Counsel have applied for an award of attorney's fees in the amount of $5,800,000, which is 20% of the Settlement Amount of $29,000,000, plus applicable gross receipts tax.  In initial and supplemental filings, Class Counsel have also applied for the reimbursement of costs in the amount of $243,496.07.

24.     The foregoing general findings are hereby incorporated by reference into each of the following sub-topics.

### TIME AND LABOR INVOLVED

25.     The services rendered by Class Counsel are reflected in their uncontradicted affidavits which have been filed in this action.  As of September 30, 2002, Class Counsel had expended approximately 7,514.57 hours since the approval of the First PSA, excluding time spent on the fee application.  That is approximately twice the number of hours spent through the approval of the First PSA. This work directly or indirectly gave rise to this second settlement.  The quality and efficiency of the services leading to the First PSA have previously been noted. *Ramah I.*  The path leading the Second PSA required a greater breadth, depth, and quantity of skills and services including lobbying skills, creative use of the internet, negotiating skills, management of statistical information, imagination and creativity in analyzing and dealing with numerous arcane substantive issues as well as many crucial procedural issues, and maintaining the balance between applying pressure to complete the settlement and patience while the government approval process continued.

12

26.     The Court has reviewed the information submitted by Class Counsel and finds that the time spent was both reasonable and necessary to achieve the Second PSA.

### NOVELTY AND DIFFICULTY OF THE QUESTIONS PRESENTED

27.     The novelty and difficulty of the questions presented is best illustrated by the decisions handed down on similar issues by the courts after June 22, 2001. These include the *Cherokee* decisions; and the ruling of the Ninth Circuit in *Shoshone-Bannock*. Had this settlement not been agreed to in principle on June 22, 2001, and had Counsel not been persistent in finalizing the settlement, there is significant doubt whether this settlement would have been concluded. The settlement concerns the lump sum years for the two new claims in this case: the Shortfall and the DCSC claims. Plaintiffs' position on liability, *citing e.g., Blackhawk Heating & Plumbing Co. v. U.S.*, 622 F.2d 539, 547, n. 6, 548 (Ct. Cl. 1980), is that an unrestricted appropriation is legally available for the payment of the contract debts of the United States, even when the agency's internal budget or Congressional committee reports limit the amount which may be spent for the stated purpose and even when the agency has otherwise obligated the appropriation. On the other hand, Defendants take the position that their obligation to pay CSC is expressly limited by the final sentence of 25 U.S.C. §450j-1(b) and by Section 314 of each year's appropriations act for the Department of the Interior. Further, the Defendants take the position that documentary proof shows that all amounts constituting the Shortfall claim have been paid. Plaintiffs did not consider this documentation to be conclusive. Further, the parties differed as to how much was due for those two years for unpaid CSC and how to define the measure of damages for the Shortfall claim. Plaintiffs contend that a larger amount of CSC was left unpaid for FY 1993 and 1994 than asserted by the government. However,

there is sufficient substance to Defendants' documentation to convince the Plaintiffs' team that this claim would have been difficult, arduous, expensive, time-consuming, and risky to further litigate.

28.    The DCSC claim presented the precise same legal issues discussed above.  Further, the DCSC claim was likewise plagued by considerable factual and conceptual disagreements.  In this case, definitional problems existed along with difficulty in determining  what categories of payments the BIA had made to contractors as part of the Secretarial funding level or as indirect costs.  Direct Contract Support Costs are not defined as such in the statute, although they are described in general terms.  The BIA not adopted regulations or guidelines defining them as IHS has done through a succession of guidelines to calculate DCSC.  Differences between the IHS and BIA systems and the nature of their contracted services further added to the conceptual disputes separating the parties.

29.    Plaintiffs engaged several consultants to evaluate damages.  As to both the Shortfall claim and the DCSC claim, Plaintiffs were faced with difficult questions of proof.  As to the DCSC claim, the BIA has not created  a separate budget category for Direct Contract Support as the Indian Health Service has done.  Plaintiffs' theory of damages as to DCSC therefore centered on the IHS model, which showed that in addition to the indirect cost rate-generated amount to cover indirect contract support, IHS added about 20% for direct contract support costs.  However, BIA insisted that its cost structure and administrative costs associated with its programs were completely different from IHS.  BIA claimed that health programs were inherently more expensive to operate than BIA's governmental,   social service, and land management programs.  For these reasons, the BIA discounted the application of the IHS  model to BIA programs.

30.    The negotiation meetings, including the mediation sessions with Senator Mitchell, were hard-fought and adversarial, although courteous.  One day before the final, ultimately

successful, session, the General Accounting Office, at Plaintiffs' previous request, produced voluminous documents relevant to the claims. This necessitated a major reworking of settlement materials Plaintiffs had prepared, most of which became unusable when the Government's negotiators arrived with a major change of negotiating position, and quickly proceeded to a "final offer" position which required a particularly adroit analysis and response by Class Counsel in a very short period of time.

31.     When the government announced that it could not proceed with settlement unless it retained the right to withdraw if even a single tribe opted-out of the new claim, the parties ultimately agreed to send a pre-settlement notice to the Class of the pending DCSC claim and of consolidation of the *Zuni* case with the *Ramah* case. The parties also sought leave of court to give the Class members the opportunity to opt out of the DCSC claim before the second settlement was concluded. These actions conferred a significant benefit on the class by eliminating any possibility that Defendants could withdraw from the settlement after approval by the Court. The result was an Order (Docket No.633) under which  (a) the *Zuni* case was consolidated with the *Ramah* case; (b) the DCSC claim was certified as a class claim for settlement purposes; (c) the class members were given notice of these adjustments and of the new claim and given a chance to opt out; and (d) the class was informed about the on-going settlement negotiations. These endeavors took months to complete. Notice was sent to the class and published. No class member opted out. The way was thus cleared for finalizing the agreement.

## AMOUNT INVOLVED AND THE RESULTS OBTAINED

32.     The Gross Common Fund of $29,000,000 is an outstanding result given the nature of the claims and their inherent difficulties. Moreover, as demonstrated herein, the Second PSA was

more difficult to achieve in the sense of the nature and number of the obstacles which had to be overcome.  Finally, the Second PSA releases only two of the three claims and those only for a two-year period; all three claims after the "lump sum years" are reserved and not released.

THE SKILL REQUISITE TO PERFORM THE LEGAL SERVICE PROPERLY

33.     The Court's findings about the experience, reputation and abilities of Mr. Gross, Mr. Rogers, and Mr. Tucker in connection with the First PSA (*Ramah I* at 1105, ¶67) apply as well to the achievement of the Second PSA.

34.     As the Court said of Mr. Gross and Mr. Rogers, "[a] limited number of attorneys in the United States share their level of expertise and accomplishment" in the area of Indian law generally and indirect cost issues.  *Id.*  Co-Class Counsel Mr. Miller is among this "limited number of attorneys".  He successfully argued the case of *Ramah Navajo School Board, Inc. v. Babbitt,* 87 F.3d 1338 (D.C. Cir. 1996), was class and direct action counsel in numerous other contract support cost cases, and was Class Counsel for Native Americans in the Exxon Valdez litigation.  His expertise in these matters generally and on the issue of direct contract support costs specifically were invaluable to the Class.  Mr. Perry, Mr. Treisman, and Mr. Amiotte provided much needed assistance and counsel in every phase of the case.  Since the First PSA hearing, both Class Counsel Gross and Co-Class Counsel Rogers have demonstrated their dependability and dedication, as shown by the smooth and speedy distribution of the first common fund, which they oversaw, the management of the common fund, and their progress in terms of equitable relief.

PRECLUSION OF OTHER EMPLOYMENT

35.     This Court noted in connection with the first settlement that this case required "a significant commitment of time on the part of Class Counsel" due to the fact that it involved the

16

representation of virtually every Indian tribe in the United States and Class Counsel was either in a small firm or a solo practitioner. *Ramah I* at 1104, ¶61.

36.    By far the largest number of hours devoted to this case and the achievement of this settlement were those of Mr. Gross, the Class Counsel. He worked 2700 hours in this regard, 45% of the total. He has devoted almost all his professional time to this case since remand in 1997.

37.    Finally, while the Court noted this case cannot, prior to the first negotiation, be viewed as a serious preclusion of all other employment, *id.* at 1104, ¶62, that changed somewhat when the case took on new dimensions. Both of the new claims were problematic, as shown by the Defendants' initial resistence to the Oglala Sioux Tribe's motion to intervene and to the Ramah Navajo Chapter's motion to amend as to the Shortfall claim, and by the Defendants' stated intention to resist class certification and deny the allegations as to the DCSC claim. The intensity of the negotiations and other difficult aspects of the case, all of which contributed to the Second PSA, were appreciably greater than in the first settlement. The significantly greater quantity of time expended during a shorter of period justifies giving greater weight to the "preclusion" factor, in connection with this second fee application.

### THE CUSTOMARY FEE

38.    The Court's finding on this factor in *Ramah I* applies with equal force here:

> The customary fee in a case such as this, outside the context of a class action, is the contingent fee arrangement where counsel receives a percentage, usually 33 1/3 percent of the recovery, if there is any, and no fee if there is no recovery. In the class action context, the customary fee is established by the common fund doctrine and as discussed above. In the Tenth Circuit, the percentage method is the preferred method for establishing the fee. For these reasons, the Court has adopted this method of determining a reasonable fee

because it most closely approximates the manner in which the marketplace would value the services provided.

*Id.* at 1104, ¶63.

## ANY PREARRANGED FEE

39.     There was no pre-arranged fee regarding this Second PSA.  The Clients did not advance Counsel's costs or the general costs of this case after the First PSA, except to pay their own way to settlement negotiations.

40.     After the first settlement was approved and paid, Class Counsel Gross, reimbursed his client Ramah Navajo Chapter the fees and expenses it had paid him since commencement of the case in 1990, approximately $100,000.00.  In the fall of 1998,  when the Oglala Sioux Tribe hired Class Counsel Gross for representation of its cap year claim for indirect contract support, he agreed in writing to be paid $195 per hour plus expenses.  These were paid.  However, because the caps issue in the *Oglala* case was identical to the caps issue in the class action, Mr. Gross voluntarily reimbursed the fees and expenses paid to him in the course of representing it in the IBCA appeal and then on appeal to the Federal Circuit.  This was not required by his contract with the Tribe.  The sum repaid was almost the same as that paid back to the Ramah Navajo Chapter.  Since then all costs in this case have been advanced by Counsel Gross  and Co-Class Counsel Rogers and Miller and their firms.

## TIME LIMITATIONS IMPOSED BY THE CLIENT OR THE CIRCUMSTANCES

41.     As with the first settlement, the funding that was the basis for these claims and this second settlement, "is critical to the continuation, vitality, and effectiveness" of the Indian Self-Determination Contracts and to the policy of Indian self-determination of the Congress.  *Ramah I* at 1105, ¶66 :

18

> The members of the Class possessed few, and in some cases no, alternative sources to make up this underfunding. This circumstance created and still creates a need to have this matter quickly resolved and to have the funds distributed to the Class.

*Id.*

42.     As in the first settlement "Counsel acted admirably to bring this complex issue to a prompt, albeit partial, resolution." *Id.*

### THE EXPERIENCE, REPUTATION, AND ABILITY OF THE ATTORNEYS

43.     This factor is addressed above in connection with the factor labeled "the skill requisite to perform the legal service properly."

### THE UNDESIRABILITY OF THE CASE

44.     In connection with the first fee application, the Court cited this as "a very significant factor in the Court's analysis." *Ramah I* at 1105, ¶68.  The Court found the case highly "undesirable" because (a) "of the risk of decertification and the complexity and obscurity of the issues presented" and (b) because of the difficulty of calculating damages in what was basically a contingent fee case. The Court also cited Counsel's dedication and skill, stating that without those qualities it is doubtful that this matter would have been litigated, much less resolved in such an exceptional manner.  These factors apply to the case as a whole, because at the outset counsel could not have predicted where the case would go.  Denial of certification or decertification as to the two new claims was possible. The two new claims were added to the case at a time when the courts were beginning to show hostility to these contract support claims.  The DCSC claim was highly problematic and, as noted, the Government had made it clear that it intended to vigorously contest class certification of that claim.  The Shortfall claim's inclusion was initially resisted.  The negotiations leading to the second

settlement were more intense.  The settlement looked highly unlikely at the commencement of the negotiations and was in doubt  until the very last moment.  Prior to mediation, direct settlement efforts had failed.  The uncertainties after the Los Angeles session were substantial.  It appeared at times that the settlement would collapse and, as time passed, the adverse case law continued to mount.

### THE NATURE AND LENGTH OF THE PROFESSIONAL RELATIONSHIP WITH THE CLIENT

45.     The Court's previous application of this factor with respect to Mr. Gross and Plaintiff Ramah Navajo Chapter applies as well to this fee application.  *Ramah I* at 1105-06, ¶69.

46.     Class Counsel Gross' relationship with the Oglala Sioux Tribe ("OST") in this case began in the fall of 1998, just after the first settlement was reached, but before it had been approved by this Court.  Mr. Gross handled an appeal from a case involving a claim for unpaid indirect contract support costs (indirect costs) for the Tribe's Public Safety Department, arising in a cap year, FY 1995.  During the course of this work,  OST asked Mr. Gross to file a contract dispute.  Later he filed a a motion to intervene on behalf of OST, based on the  Shortfall claim which represents one of the two claims at the center of the instant settlement.  He undertook this work with the understanding that OST would not be required to advance costs or pay fees except as a result of a common fund award based on a further recovery in this case.  However, he was being paid by the Oglala Tribe for work on the "cap" issue during this period with, as noted, no expectation of reimbursement at that time.  Mr. Miller's work for the Pueblo of Zuni began in the summer of 1999 in connection with the DCSC claims.

## AWARD IN SIMILAR CASES

47.     In considering "similar cases" it is appropriate to include not only class action cases but all contingent fee litigation.  It is not uncommon for contingent fee cases to be taken on a one-third contingent fee or higher.

48.     As noted, the starting point in class action litigation is the benchmark of 25%, with adjustments up or down depending on the circumstances.

49.     None of the *Johnson* factors would support a downward adjustment from the benchmark.  Where the recovery is unusually large, some courts will apply a downward adjustment to avoid a "windfall" to class counsel.  The recovery in this case, while outstanding, does not fall in this category.

50.     In considering "awards in similar cases," the Court has reviewed, among other authorities, class action cases in this circuit where the recovery was in the range of the recovery here. From that review, the Court concludes that the requested fee of 20% requested falls well within the range of "awards in similar cases.  *Cimarron Pipeline Construction, Inc. v. National Council on Compensation Insurance,* 1993-2 Trade Cas. (CCH) ¶70,310 (WD Okla 1993) (fee award of 33.6% on a recovery of $35 million); *In re Public Service Co. of New Mexico,* (1992 Transfer Binder), Fed. Sec. L. Rep. (CCH) ¶96,988 (S.D. Cal. 1992) (litigated in New Mexico federal court) (fee award of 33.4% on a recovery of $33 million); *In re United Telecommunications, Inc. Sec. Litig.,* 1994 WL 326007 (D. Kan. 1994) (fee award of 33% on a recovery of $28 million); *In re Sun Healthcare Group, Inc., Litig.,* No. 95-7005 JC/WWD (D.N.M. 1997) (fee award of 30% on a recovery of $24 million).

21

REQUESTED REIMBURSEMENT OF COSTS

51.     Class Counsel has also submitted a detailed application for reimbursement of costs incurred in the course of representing the Class, which application sets forth the type and amount of costs incurred Class since the First PSA.  The amount of such costs is $243,496.07.  The Court finds that these costs were reasonably and necessarily incurred and that the reimbursement of such costs, out of the settlement proceeds, in addition to the award of attorney's fees, is reasonable and shall be made at the time the first payment of Counsel's fee is made.

52.     It would be unfair to delay reimbursement of costs until the final conclusion of this case.

## CONCLUSIONS OF LAW

1.     The Court has jurisdiction over this matter pursuant to 25 U.S.C. §450m-1 and the mandate of the Court of Appeals for the Tenth Circuit.

2.     The Second Partial Settlement Agreement of September 9, 2002, is fair reasonable, and adequate and a beneficial outcome for the Class.  It will be approved.

3.     No one objected to the approval of the Second Partial Settlement Agreement or to the application for attorney's fees and costs.  While the Court takes this fact into consideration in evaluating both the fairness of the settlement agreement and the fee application, it has no effect whatsoever on this Court's role as a fiduciary for the absent class members.  The Court has undertaken its own independent evaluation and review of both the settlement agreement and the fee application in fulfillment of that responsibility.

4.     The Defendants have not filed a response or opposition to the Application for Award of Attorney's Fees and Costs.

22

5.      The Second PSA meets the criteria set forth in Federal Rule of Civil Procedure 23(e).

6.      Attorneys who represent a Class and, through their efforts, create a common fund, are entitled to compensation for their services from that fund to avoid unjust enrichment.  *See Boeing Co. v. Van Gemert,* 444 U.S. 472, 478, 100 S. Ct. 745, 62 L.Ed.2d 676 (1980); *Gottlieb v. Barry,* 43 F. 3d 474, 482 (10th Cir. 1994); *Brown v. Phillips Petroleum Co.,* 838 F.2d 451, 454 (10th Cir. 1988).

7.      In determining reasonable attorney's fees in common fund cases the Tenth Circuit has expressed a "preference" for the "percentage-of-the-fund" method over the "lodestar" method.  *See e.g., Gottlieb,* 43 F.3d at 483 (citing *Uselton v. Commercial Lovelace Motor Freight, Inc.,* 9 F.3d 849 (10th Cir. 1993)); *see also, Rosenbaum v. MacAllister,* 64 F.3d 1439, 1445 (10th Cir. 1995).  This Court has recently recognized this preference.  *See In re Horizon/CMS Healthcare Corp. Sec. Litig.,* 3 F.Supp.2d 1208, 1211 (D.N.M. 1998) ("[t]he Court recognized the Tenth Circuit Court of Appeals has expressed a general preference for awarding attorney's fees through the percentage method").

8.      The Supreme Court has recognized that in common fund actions "a reasonable fee is based on a percentage of the fund bestowed on the class**,**" distinguishing fees calculated under 42 U.S.C. §1988 which are based on time spent.  *See Blum v. Stenson,* 465 U.S. 886, 900 n. 16, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984).

9.      For these and other reasons expressed in *Ramah I,* 50 Supp.2d at 1108, the Court concludes that fees should be calculated according to the percentage-of-the-fund method.

10.     Under the percentage-of-the-fund method, an appropriate starting point is the 25% benchmark established by the case law, with adjustments to be made up or down based on the factors articulated in *Johnson v. Georgia Highway Express, Inc.,* 488 F.2d 714 (5th Cir. 1974).  *Gottlieb,* 43

23

F.3d at 482-83, 488; *Brown*, at 454-55.  *See also*, MANUAL FOR COMPLEX LITIGATION, at §12.121, p. 189.

  11. The Court has taken into account the *Johnson* factors.  In this case, a reasonable fee is derived by giving greater weight to the results obtained, the novelty and difficulty of the issues, and the skill of counsel than to the time spent.  The two claims that form the basis for the Second PSA are related to, but quite distinct from, the claims that formed the basis for the First PSA.  The new claims had to stand or fall on their own merits.  In that sense, the proceedings that began with adding the new claims to the instant case and carried them forward to this settlement constitute, in essence, a new case.  At the outset of this new case, the recovery of any money was highly uncertain and contingent.  The issues of liability were issues of first impression and not clear-cut.  The government's liability has grown even more problematic by a significant and growing body of case law against the theory of the Class.  *Oglala, Shoshone-Bannock,* and *Cherokee.*  The issues of liability and damages were surrounded by a legal and factual thicket.  Class Counsel took on these claims with great vigor and at great risk of recovering nothing.  The Defendants were represented by excellent attorneys and had the resources of the federal government at hand.

  12. The outstanding result would not have been achieved without the commendable effort of Class Counsel, for which they should be paid a reasonable percentage of the Gross Common Fund.  The Court concludes, for the reasons discussed above, that a fee of 20% of the Gross Common fund of $29,000,000 and an award of New Mexico gross receipts tax on those fees, is reasonable.  The Court therefore awards 20% of the Gross Common Fund, or $5,800,000  in attorney's fees to Class Counsel.  The Court also awards New Mexico gross receipts tax on those fees.  These funds are to be paid out of the Gross Common Fund in the manner described above.

13.     The Court finds that the requested sum of $243,496.07 as costs is appropriate, legally authorized, and reasonable and shall be awarded in addition to the attorney's fee.

14.     The award of attorney's fees and costs shall be paid as provided in Section VII.C of the Second PSA.

The Court enters an Order and Partial Final Judgment under Rule 54(b), executing these Findings of Fact and Conclusions of Law, contemporaneously with this Memorandum Opinion.

_____
**UNITED STATES DISTRICT JUDGE**