**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF NEW MEXICO**

**RAMAH NAVAJO CHAPTER,**
**OGLALA SIOUX TRIBE** and
**PUEBLO OF ZUNI**, for themselves
and on behalf of a Class of persons
similarly situated,

Plaintiffs,

v. **CIV No. 90-957 LH/WWD ACE**

**GALE NORTON**, Secretary of the
United States Department of Interior, et al.,

Defendants.

**MEMORANDUM OPINION AND ORDER**

**THIS MATTER** comes before the Court on Plaintiffs' Amended Motion for Partial Summary Judgment or in the Alternative to Strike Defense (Docket No. 570).[1] Also under consideration is Defendants' document that contains both a cross-motion for partial summary judgment and a response to Plaintiffs' motion (Docket No. 592).[2]

Plaintiffs' amended motion seeks "judgment in their favor declaring that annual appropriations limitations for FY 1994 forward inserted by Congress as to the amount which the Secretary may use

[1] This amended motion supercedes the original motion, filed on February 23, 2000 (Docket No. 397).

[2] Defendants' motion has the burdensome title, "Defendants' Cross-Motion for Partial Summary Judgment and Opposition to Plaintiffs' Amended Motion for Partial Summary Judgment or in the Alternative to Strike Defense and Opposition to *Amicus* Pueblo of Zuni's Brief in Support of Plaintiffs' Amended Motion for Partial Summary Judgment" (Docket No. 594), referred to herein simply as "Defendants' Cross-Motion" or "Defendants' Response." Defendants also filed a separate response to Plaintiffs' statement of facts (Docket No. 596).

to reimburse contract support costs ("CSC") under contracts with Class members entered pursuant to The Indian Self-Determination and Education Assistance Act of 1975, as amended, 25 U.S.C. Section 450 through 450n ("ISDA"), do not diminish or eliminate (either alone or coupled with ISDA) the obligation of the United States to reimburse CSC at the full level mandated by ISDA otherwise owed to Plaintiffs." (Docket No. 570 at 1).[3] Footnote 1 of the motion specifically states that the appropriations acts at issue are: Public Law 103-138, Public Law 103-272, Public Law 104-134, Public Law 104-208, Public Law 105-83, Public Law 105-277, Public Law 106-113, and Public Law 106-291.

This motion clarifies it applies to the claims, not yet settled for the years FY 1994 and thereafter, including the original cause of action upheld in *Ramah Navajo Chapter v. Lujan*, 112 F.3d 1455 (10th Cir. 1997), and the Class's second cause of action added by amendment (*see* Docket No. 352) and by complaint in intervention (*see* Docket No. 353).

The second cause of action added by amendment is entitled a "Claim for Underpayment of Indirect Costs for Alleged Insufficiency of Appropriations" (Docket No. 352). This claim specifically states that it applies to the indirect cost shortfalls that have occurred in each fiscal year since FY 1994, when Congress began inserting the phrase "not to exceed" before the specific dollar amount for contract support under ISDA contracts or compacts. Paragraph 29 of this claim states that shortfalls in indirect cost payments to the Class caused by alleged insufficiency of appropriations are different from but also encompass the underpayment of indirect costs to the Class caused by under-calculation of indirect cost rates as pled and litigated to this point in *Ramah Navajo Chapter v. Lujan*,

[3]This motion relies upon materials that accompanied the original motion (Docket No. 397), Attachments A-H, as well as those attached to this amended motion, Attachments I-S. The motion also incorporates by reference Plaintiffs' Attachments to their Motion for Partial Summary Judgment (Docket No. 58).

112 F.3d 1455 (10th Cir. 1997). This claim asserts that the United States owes to Plaintiff and the members of the Class the difference between the contract amount for contract support set by each applicable contract or annual funding agreement for each fiscal year since the beginning of 1994, and the level of reimbursements received (Docket No. 352, ¶ 36).

In its complaint in intervention (Docket No. 353), the Oglala Sioux Tribe states that it seeks to intervene for the purpose of expanding its original claim to encompass all class-wide shortfalls. (*Id.*, ¶ 1). Specifically, in this complaint, Plaintiff-in-Intervention states that it seeks damages for all shortfalls during and since FY 1994, caused by Defendants' assertion that they did not have sufficient funds from annual appropriations to cover 100% of their "need." *Id.*

Defendants filed a cross-motion for partial summary judgment (Docket No. 592), arguing that this Court should hold that Defendants are entitled to judgment as a matter of law on all of Plaintiffs' claims for FY 1994 to the present, based on the conclusion that the ISDA limits the liability of the government to pay Plaintiffs' contract support costs based upon available United States Department of Interior appropriations.

The Court, having read the cross motions for partial summary judgment, as well as all supporting and opposing briefs, including supplementary briefs, the full court record, relevant statutes and case law, for the reasons that follow, concludes that Plaintiffs' motion shall be denied and the Government's motion shall be granted insofar as it opposes Plaintiffs' motion for partial summary judgment.[4]

[4] The real focus of Defendants' cross-motion is its opposition to Plaintiffs' motion for partial summary judgment. Given the result contained in this Memorandum Opinion and Order, it is unnecessary for the Court to reach the alternatives alluded to in the title of Defendants' cross-motion, *i.e.*, the striking of a defense or of an *amicus* brief.

**Procedural Background**

This class action arises under the Indian Self-Determination and Education Assistance Act ("ISDA"), 25 U.S.C. § 450, *et seq*. This statute authorizes the Bureau of Indian Affairs ("BIA"), a component of the United States Department of the Interior ("DOI"), to contract with and fund Indian tribes and tribal organizations that choose to take over the operations of programs and services formerly operated by the BIA.

Plaintiffs are tribal contractors who have sued DOI and several of its officials (collectively referred to herein as "Defendants"), alleging violations of the ISDA. In essence, Plaintiffs claim that, as tribal contractors, they are entitled to receive full payment of all contract support costs they seek under their ISDA contracts.

The motions now under consideration were briefed in 2001 and stayed in 2002 (Docket 671), pending completion of the appeal of *Cherokee Nation of Okla. v. Thompson*, 311 F.3d 1054 (10th Cir. 2002). The appeal was ultimately decided by the United States Supreme Court in March 2005, in *Cherokee Nation of Okla. v. Leavitt*, 543 U.S. 631 (2005)("*Cherokee Nation*"). The stay was lifted on May 6, 2005, and supplemental briefing was concluded on October 21, 2005.

**Statutory Language**

As in any case of statutory interpretation, the Court will begin with the language of the relevant statutes. The ISDA's stated purpose is to allow Native American tribes to operate their own federal programs directly. Under the ISDA, a tribe and the Secretary of Interior enter into a "self-determination contract," which incorporates the provisions of the model contract contained in the ISDA text. *See* 25 U.S.C. § 450*l*(a), (c) (1994).

The Act specifies that the Government must pay a tribe's costs, including administrative expenses. *See* 25 U.S.C. §§ 450j-l(a)(1) and (2). Administrative expenses include: (1) the amount that the agency would have spent "for the operation of the progra[m]" had the agency itself managed the program, *id.* § 450j-1(a)(1); and, (2) "contract support costs," the costs at issue in this case. *id.* § 450j-1(a)(2).

The Act defines "contract support costs" as other "reasonable costs" that a federal agency would not have incurred, but which nonetheless "a tribal organization" acting "as a contractor" would incur "to ensure compliance with the terms of the contract and prudent management." *id.* § 450j-1(a)(2). "Contract support costs" can include indirect administrative costs, such as special auditing or other financial management costs, *id.* § 450j-1(a)(3)(A)(ii); they can include direct costs, such as workers' compensation insurance, *id.* § 450j-1(a)(3)(A)(i); and they can include certain startup costs, *id.* § 450j-1(a)(5). Most contract support costs are indirect costs "generally calculated by applying an 'indirect cost rate' to the amount of funds otherwise payable to the Tribe." *Cherokee Nation*, 543 U.S. at 635 (citation omitted); *see* 25 U.S.C. §§ 450b(f)-(g).

Section 25 U.S.C. § 450j-1 is entitled "Contract funding and indirect costs." Subsection (a) describes the amount of funds to be provided. For example, DOI is obligated to provide direct costs "not less than the appropriate Secretary would have otherwise provided for the operation of the programs . . . for the period covered by the contract." 25 U.S.C. § 450j-1(a)(1). In addition, DOI must supply "contract support costs which shall consist of an amount for the reasonable costs for activities which must be carried on by a tribal organization as a contractor to ensure compliance with the terms of the contract and prudent management. . . ." *Id.* § 450j-1(a)(2). The next subsection, 450j-1(b), describes reductions and increases in the amount of funds provided. This subsection

concludes with the unequivocal statement that: "Notwithstanding any other provision in this subchapter, the provision of funds under this subchapter is subject to the availability of appropriations . . . ." *id*. § 450j-1(b). *See also* 25 U.S.C. § 450-j(c)(1)("The amounts of [self-determination] contracts shall be subject to the availability of appropriations.")

Section 450*l* of the ISDA contains a model agreement that provides that the "[f]unding amount" of the contracts are "subject to the availability of appropriations." *See* Section 1(b)(4) of the Model Contract, 25 U.S.C. § 450*l*(c). Plaintiffs' actual self-determination contracts contain similar language. (*See* Ex. B to Defs.' Suppl. Mem.). Such provisions make clear that the contractual liability of the Government is subject to the availability of appropriations, and that disbursement of those available funds will be made according to the BIA's "policies and procedures," including procedures for the pro rata distribution of available funds. *Id.*; *see also* Smith Decl., ¶ 4 (*See* Ex. E to Defs.' Suppl. Mem.)(explaining that the BIA sends out notices each fiscal year that set forth the procedures for the pro rata distribution of contract support costs).

The Court has examined the relevant BIA Appropriations Acts. (*See* Ex. A to Defs.' Suppl. Mem.). The first "not to exceed" language, or "cap", was inserted in the appropriation Act for FY 1994, Public Law 103-138: ". . . Provided further, that not to exceed $91,223,000 of the funds in this Act shall be available for payments to tribes and tribal organizations for indirect costs associated with contracts or grants or compacts authorized by the Indian Self-Determination Act of 1975, as amended, for FY 1994 and previous years. . . ."[5] The FY 1995 appropriation act, Public Law 103-332, included

[5] Congress was well aware that there might be shortfalls in contract support costs for ISDA contracts, and it provided for consideration of the shortfalls within the appropriations process. In particular, section 450j-1(c) requires the Secretary to provide an annual report to Congress, including "(2) an accounting of any deficiency in funds needed to provide required contract support costs to all contractors for the fiscal year in which the report is being submitted; . . . . " Pursuant to its reporting requirements, each fiscal year, BIA prepares a table setting forth

similar cap language but substituted the phrase "contract support costs" for "indirect costs," as has every appropriation act since then. The later language covers both indirect and direct contract support payments. (*See* Pls.' Mem. in Supp. of Amend. Mot. for Partial Summ. J., Docket No. 571, n.4).

The language in each of these acts generally follows the same pattern. For example, the 1998 appropriations act, 111 Stat. 1543 (Nov. 14, 1997), provides that nearly $1.53 billion will be provided for the operation of a wide variety of Indian programs, and that the funds will remain available until September 30, 1999. Of this appropriated amount, the Act provides that "not to exceed $105,829,000 shall be for payments to tribes and tribal organizations for contract support costs associated with ongoing contracts or grants or compacts entered into with the Bureau prior to fiscal year 1998, as authorized by the Indian Self-Determination Act of 1975, as amended . . . ."

**Material Facts Not in Dispute**

These facts appear to be undisputed:

1. For every fiscal year since 1994, Congress has placed a cap in the annual appropriations acts for BIA limiting the amount of funding the Secretary could expend from the appropriations.

2. In every fiscal year since 1994, BIA has distributed to tribal contractors the full amount of CSC funding appropriated for that purpose in Public Laws 103-138, 103-332, 104-134, 104-208, 105-83, 106-113, 106-291.

3. The amounts needed by tribal contractors for CSC each year have exceeded the amount of appropriated funds that Congress set aside each year since 1994 for that purpose. For example, in

---

the shortfalls in CSC. *See* Declaration of Harry Rainbolt ("Rainbolt Decl."), ¶¶ 3-6 (Ex. C to Defs.' Cross-Mot. for Partial Summ. J. This table is included in the annual President's Budget Request to Congress each fiscal year to aid Congress in the appropriation process. *Id.*¶¶ 5-6.

2001, CSC needs exceeded Congress's $125,209,000 CSC cap by $16 million. (*See* Rainbolt Decl., ¶ 6, Ex. C to Defs.' Cross-Mot. for Partial Summ. J).

**Legal Discussion**

Both the Federal and D.C. Circuits have addressed the issue in this case, ruling that caps on appropriations, in conjunction with the "availability of appropriations" language in the ISDA, limit the liability of the government to pay additional amounts of contract support costs, even if this means that the amount provided is less than the amount negotiated in the self-determination contracts. Congress has the authority to determine the amount of appropriated funds the agency may obligate under self-determination contracts, and it has exercised that authority by providing that the amounts of such contracts are "subject to the availability of appropriations," and by placing caps in appropriations statutes. These cases have concluded that the ISDA and its model contracts do not create enforceable obligations of the United States for payment of contract support costs ("CSC") in amounts in excess of "capped" CSC appropriations.

*Babbitt v. Oglala Sioux Tribal Public Safety Dept.*, 194 F.3d 1374 (Fed. Cir. 1999), is the Federal Circuit case that examined this issue. That case involved the Oglala Sioux Tribal Public Safety Department, a tribal organization operating an ISDA contract for public safety on the Pine Ridge Reservation in South Dakota for the Oglala Sioux Tribe. In the lawsuit, for fiscal year 1995, Oglala sought reimbursement of the difference between the originally negotiated amount and what it actually received from the Secretary of Interior, a difference of $108,506.00. For fiscal year 1995, Congress appropriated $1.5 billion for the operation of Native American programs, "of which not to exceed $95,823,000 shall be for payments . . . for contract support costs" for contracts authorized by the

ISDA. *See* Interior Appropriations Act of 1995, Pub.L.No. 103-332, 108 Stat. 2499, 2511 (1994).

The Federal Circuit concluded that the language of § 450j-1(b) is clear and unambiguous and that any funds provided under an ISDA contract are "subject to the availability of appropriations." That Court noted that the clause preceding this limitation, "[n]otwithstanding any other provision in this subchapter," further clarifies that other language in the ISDA[6] cannot "trump" this express restriction on ISDA funding. *Id.* at 1378. The Court went on to rely on §§ 450j(c)[7] and 450*l*(c)[8], as indicators of congressional intent to make ISDA funding subject to the availability of funding.

The *Oglala Sioux* Court also concluded that the general intent underlying the ISDA could not trump the express language of the statute. It noted that in the face of congressional under-funding, an agency can only spend as much money as has been appropriated for a particular program. Relying on various canons of statutory construction, the *Oglala Sioux* Court also rejected an argument that Congress intended ISDA indirect costs to be fully funded, noting that such an interpretation of congressional intent would render the "subject-to" appropriations language of § 450j-1(b) meaningless. The Court stated that it would exceed its judicial function if it were to repeal the unambiguous language of § 450j-1(b) in such a fashion, and that it must assume that Congress "says in a statute what it means and means in a statute what it says there . . . . When the words of a statute are unambiguous, then, . . . 'judicial inquiry is complete.' " *Id.* at 1378, quoting *Connecticut Nat'l Bank*

---

[6]*See* 450-j-1(f): "Upon the approval of a self-determination contract, the Secretary shall add to the contract the full amount of funds to which the contractor is entitled under subsection (a)."

[7] This section sets the term of self-determination contracts and states "[t]he amounts of such contracts shall be subject to the availability of appropriations."

[8] As mentioned above, this section sets out language of the model agreement referred to in each self-determination contract under the ISDA, which specifies that "[s]ubject to the availability of appropriations, the Secretary shall make available to the Contractor the total amount specified in the annual funding agreement. . . ."

*v. Germain*, 503 U.S. 249, 253-54 (1992)(internal citations omitted) (quoting *Rubin v. United States*, 449 U.S. 424, 430 (1981)).

The *Oglala Sioux* Court distinguished *New York Airways, Inc. v. United States*, 369 F.2d 743 (1966), noting that that case involved a situation in which the Government, as a contracting party, had simply failed to appropriate and pay its unqualified contractual obligation. The *Oglala Sioux* Court noted that the situation before it "differs fundamentally in that the ability of Interior to bind the Government contractually was expressly conditioned on the availability of appropriations." *Oglala Sioux* 194 F.3d at 1379. Accordingly, that Court found the *New York Airways* analysis and conclusion unpersuasive.

The *Oglala Sioux* Court noted that the D.C. Circuit "found the language of 450-j-1(b) as clear as we do," and reached the same conclusion in the case of *Ramah Navajo Sch. Bd., Inc. v. Babbitt*, 87 F.3d 1338 (D.C. Cir. 1996)("*Ramah I*"). *Oglala Sioux*, 194 F.3d at 1379. *Ramah I* discussed § 450-j-1(b) of the ISDA in its analysis of how much discretion the Secretary had to allocate indirect funds with respect to the 1995 congressional cap on the appropriation amount available for ISDA contract support costs. The *Ramah I* Court noted that the Secretary is "not required to distribute money if Congress does not allocate that money to him under the Act. The first part of the provision [§ 450-j-1(b)] says just that . . . ." *Ramah I*, 87 F.3d at 1345. The Court then concluded that despite a Tribe's claim that it is entitled to the funds under the ISDA, if the money is not available, it need not be provided. *Id.*[9]

[9] The ultimate outcome in *Ramah I* turned on the validity of the Secretary's 1995 allocation plan for the limited amount of indirect cost money available.

***Cherokee Nation* is Distinguishable from this Case**

This Court agreed to stay the parties' cross-motions for partial summary judgment, based on its stated belief that it was substantially likely that the issues before the Court in these motions would be addressed in a case that was then pending in the Tenth Circuit Court of Appeals[10] and that was ultimately appealed to the Supreme Court in *Cherokee Nation v. Leavitt*, 543 U.S. 631 (2005). In fact, as noted by Plaintiffs in their supplemental memorandum (Docket No. 962), filed following entry of the Supreme Court opinion, the *Cherokee Nation* case did not reach pivotal issues that remain to be decided by this Court.

Specifically, while arguing that *Cherokee Nation* "affirmed the sanctity of ISDA contracts," Plaintiffs acknowledge that the Supreme Court did not reach the issue as to whether the United States remains liable for shortfalls in contract payments, when Congress has specified an insufficient "not to exceed" lump sum appropriation. (Pls.'Mem. in Supp. of Amend. Mot. for Partial Summ. J. at 2). They also note that the Supreme Court failed to reach the issue as to whether the phrase "subject to availability of appropriations" speaks to the Secretary's expenditure authority or to the liability of the United States. Finally, they note that the Supreme Court did not reach the issue of whether or not the United States remains liable for the full contract amount if the agency fails to request an adequate appropriation and the contract does not clearly impose the risk of an inadequate request on the contractor.

The Supreme Court granted certiorari and consolidated two Court of Appeals cases[11] that

---

[10] *See Cherokee Nation of Okla. v. Thompson*, 311 F.3d 1054 (10th Cir. 2002).

[11] *See Cherokee Nation of Okla. v. Thompson*, 311 F.3d 1054 (10th Cir. 2002) and *Thompson v. Cherokee Nation of Okla.*, 334 F.3d 1075 (Fed. Cir. 2003).

contained identical claims yet reached opposite results. In these cases, the United States and two Indian Tribes had entered into agreements in which the Government promised to pay certain "contract support costs" that the Tribes incurred during fiscal years 1994 through 1997. The Tribes made claims for $3.5 million (Shoshone-Paiute) and $3.4 million (Cherokee Nation) in the first case, and $8.5 million (Cherokee Nation) in the second case. In *Cherokee Nation*, the Supreme Court addressed the Government's liability for contract under-payments in years when Congress did not limit the amount of funds available to the agency to pay the contracts. The parties colloquially call such claims the "lump sum" claims, because the agency simply had a large "lump sum" appropriation from which to pay the contracts.

The Supreme Court phrased the question before it as being "whether the Government's promises are legally binding," and concluded that they are, under the circumstances then before the Court. *Cherokee Nation*, 543 U.S. at 634. In *Cherokee Nation*, Plaintiffs' claims were for far less than the amounts appropriated by Congress (between $1.277 billion and $1.419 billion) for the Indian Health Service to "carry out," the Indian Self-Determination Act. *See* 107 Stat. 1408 (1993); 108 Stat. 2527-2528 (1994); 110 Stat. 1321-189 (1996); *id.* at 3009-212 to 3009-213 (1996). According to the Supreme Court opinion, *"[T]hese appropriations Acts contained no relevant statutory restriction."* *Cherokee Nation*, 543 U.S. at 637 (emphasis added).

All four of the statutes that were before the Supreme Court in the *Cherokee Nation* case contain language similar to each other. For example, the earliest statute, 107 Stat. 1408 (Nov. 11, 1993) appropriated approximately $1.646 billion for services furnished by the Indian Health Service. Of these funds, approximately $3.61 million were specifically allocated or restricted to the following uses: $12 million for the Indian Catastrophic Health Emergency Fund; $337.8 million for contract

medical care; and, $11.52 million for a loan repayment program. The amount of *unrestricted* funds in this statute is approximately $1.28 billion. The other three statutes provide restrictions for the same categories, but with different amounts for each fiscal year. These other statutes provide for unrestricted funds that range from $1.43 billion to $1.37 billion.

The Supreme Court concluded: "Since Congress appropriated *adequate unrestricted funds* here, [the subject to the availability of appropriations language], if interpreted as ordinarily understood, would not help the Government." *Id*. at 643 (emphasis added). In its opinion, *Cherokee Nation* made repeated reference to the lack of legally binding restrictions in the IHS lump-sum appropriations, implicitly making the distinction between the type of lump-sum appropriations without legal restriction in that case, and the restrictive appropriation statutes now before this Court, containing statutory earmarks and caps. *Id*. at 639-643. The Supreme Court noted that a "fundamental principle of appropriations law [is] that where Congress merely appropriates lump-sum amounts without statutorily restricting what can be done with those funds, a clear inference arises that it does not intend to impose legally binding restrictions. . . . " *Id*. at 637 (internal quotations omitted).

As acknowledged by Plaintiffs, the Supreme Court did not directly address the liability of the Government when there is a capped appropriation that bulks together funds owed to hundreds of contracts, as in the immediate case. This is a very different statutory scheme from that considered by the *Cherokee Nation* court. The obvious implication from the *Cherokee Nation* case is that, where there are legal restrictions in the agency's appropriations, the "subject to the availability of appropriations" language serves to limit governmental liability under the contracts to the amount of those restricted funds.

Conversely, the "subject to the availability of appropriations" language, given its ordinary

meaning, "normally makes clear that an agency and a contracting party can negotiate a contract prior to the beginning of a fiscal year but that the contract will not become *binding* unless and until Congress appropriates funds for that year. It also makes clear that a Government contracting officer lacks any special statutory authority needed to bind the Government without regard to the availability of appropriations." *Cherokee Nation*, 543 U.S. at 643 (citations omitted).

**Conclusion**

This case, like the *Oglala Sioux* and *Ramah I* cases, involves the issue of congressional under-appropriations of funds. This Court is persuaded by the logic of the *Oglala Sioux* and *Ramah I* cases, and reaches the same conclusion that the United States is not liable for shortfalls in contract payments when Congress has specified an insufficient "not to exceed" lump sum appropriation. This language does not speak to the Secretary's expenditure authority, but ultimately to the lack of liability of the United States to pay contract support costs in excess of the appropriated, capped dollar amounts. The ISDA and its model contracts do not create enforceable obligations of the United States for payment of contract support costs in amounts in excess of capped contract support cost appropriations.

Congress has the authority to determine the amount of appropriated funds the agency may obligate under self-determination contracts, and it has exercised that authority by providing that the amounts of such contracts are "subject to the availability of appropriations," and by placing caps in the BIA's appropriations statutes. These appropriations were made with Congressional knowledge of the potential for CSC shortfalls for ISDA contracts and it provided for consideration of the shortfalls within the appropriations process.

**WHEREFORE**, for the reasons stated herein, Plaintiffs' Amended Motion for Partial

Summary Judgment or in the Alternative to Strike Defense (Docket No. 570) is **denied**; and Defendants' Cross-Motion for Partial Summary Judgment and Opposition to Plaintiffs' Amended Motion for Partial Summary Judgment or in the Alternative to Strike Defense and Opposition to *Amicus* Pueblo of Zuni's Brief in Support of Plaintiffs' Amended Motion for Partial Summary Judgment (Docket No. 594) is **granted** to the extent that it opposes Plaintiffs' amended motion for partial summary judgment.

**FURTHERMORE**, the Court notes that this Memorandum Opinion and Order resolves all remaining pending motions before the Court. The parties are hereby instructed to inform the Court, in writing, within fifteen (15) days, whether or not any issues remain in this matter that require the further attention of the Court, prior to entry of a Final Judgment.

**IT IS SO ORDERED.**

**SENIOR UNITED STATES DISTRICT JUDGE**