## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW MEXICO

**RAMAH NAVAJO CHAPTER,**
**OGLALA SIOUX TRIBE, and**
**PUEBLO OF ZUNI, for themselves**
**and on behalf of a class of persons**
**similarly situated,**

      **Plaintiffs,**

**vs.**                    **No. 90 CV 957 JAP/KBM**

**SALLY JEWELL, Secretary of Interior,**
**in her official capacity,**
**LAWRENCE S. ROBERTS, Acting Assistant Secretary,**
**Indian Affairs, in his official capacity,**
**and**
**UNITED STATES OF AMERICA,**

      **Defendants.**

## FINDINGS OF FACT AND CONCLUSIONS OF LAW APPROVING FINAL SETTLEMENT AGREEMENT AND AWARDING ATTORNEYS' FEES AND COSTS

On September 30, 2015, the Court granted preliminary approval of the final settlement

agreement (FSA) (Doc. No. 1306-1) in this class action and ordered that notice be sent to all

class members. *See* ORDER GRANTING PRELIMINARY APPROVAL OF FINAL

SETTLEMENT AGREEMENT; DIRECTING NOTICE TO BE SENT TO THE CLASS; AND

SETTING FAIRNESS HEARING (Doc. No. 1314). The Court has ruled on the sole objection to

the FSA in which the United South Eastern Tribes, Inc. (USET) argued that it was improperly

excluded from the Class members listed in Appendix 2 of the FSA. *See* NOTICE OF

INTENTION TO APPEAR AND OBJECT TO FINAL SETTLEMENT AGREEMENT (Doc.

1

No. 1324) (Objection); JOINT MEMORANDUM IN RESPONSE TO OBJECTION BY

UNITED SOUTH AND EASTERN TRIBES, INC. (Doc. No. 1328).[1] The Court sustained in

part and overruled in part the Objection. *See* ORDER SUSTAINING IN PART THE

OBJECTION BY UNITED SOUTH AND EASTERN TRIBES, INC. AND DIRECTING

NOTICE TO BE SENT TO 26 NEWLY-IDENTIFIED CLASS MEMBERS (Doc. No. 1329).

On January 8, 2016, the parties filed their JOINT MOTION FOR FINAL APPROVAL

OF FINAL SETTLEMENT AGREEMENT (Doc. No. 1334) (Motion for Final Approval). The

same day, Class Counsel filed their CONSENT MOTION FOR FINAL APPROVAL OF

CLASS COUNSEL'S APPLICATION FOR AN AWARD OF FEES AND COSTS, WITH

SUPPLEMENTAL AUTHORITIES ADDRESSING THE ABSENCE OF OBJECTIONS (Doc.

No. 1335) (Consent Motion for Approval of Attorneys' Fees). Class Counsel had filed their

CLASS COUNSEL APPLICATION FOR AWARD OF ATTORNEY FEES AND COSTS

(Doc. No. 1313) (Application) on September 29, 2015.

On January 20, 2016, the Court held a fairness hearing on the Motion for Final Approval

and the Consent Motion for Approval of Attorneys' Fees. Present at the hearing were Class

Counsel: Michael P. Gross, C. Bryant Rogers, and Lloyd B. Miller and Counsel for the

Defendants (the Government): James Todd, Ryan Parker, and Eric Womack. In addition, other

attorneys appeared on behalf of the Class: Don Simon, Lia Carpeneti, Tom Bird, Paul Frye, and

Dan MacMeekin. Dignitaries from the Class Representatives and other dignitaries who attended

the fairness hearing included: Navajo Nation President Peter Zah, Ramah Navajo Chapter

---

[1] The FSA defines the Class as "Indian Tribes and tribal organizations that have contracted or entered into self-governance funding agreements with the Secretary of the Interior through the BIA or the Office of Self Governance ("OSG") (collectively hereafter, "BIA") under the ISDA during any year between fiscal years 1994 through 2013." FSA at 3. The Class "includes . . . Tribes which at one time opted out of the Class, but were thereafter permitted to re-enter the Class by Orders dated September 22, 1998 (Dkt. No. 198), December 3, 1998 (Dkt. No. 247), December 8, 1998 (Dkt. No. 250), August 1, 2000 (Dkt. No. 462)." (*Id.*)

President David Jose, Oglala Sioux Tribe President John Yellowbird Steele, and Pueblo of Zuni Governor Val Panteah and Lt. Governor Birdina Sanchez.

The Court considered the FSA, the evidence, the arguments of the parties, including affidavits of Class Counsel and the Class Representatives. In addition, the Court heard arguments by Class Counsel, by other attorneys representing the Class, and by Counsel for the Government. During the hearing, the Court concluded that the FSA is in the best interest of the Class and should be approved.

As to the Consent Motion for Approval of Attorneys' Fees, during the January 20, 2016 hearing the Court asked whether the notice to the Class members clearly stated how the New Mexico Gross Receipts Taxes (NMGRT) on the attorneys' fees would be paid. Class Counsel, Class Representatives, and Counsel for the Government conferred and reached an agreement clarifying responsibility for the payment of NMGRT on attorneys' fees and said they would submit a written stipulation memorializing their agreement. In early February, 2016, the Court received the JOINT STIPULATION REGARDING REIMBURSEMENT OF GROSS RECEIPTS TAX ON ATTORNEYS' FEE AWARD (Doc. No. 1344) (Joint Stipulation). The Court found that the Joint Stipulation clarified the obligations regarding payment of the New Mexico Gross Receipts Taxes. On February 19, 2016, the Court entered an Order (Doc. No. 1345) adopting the Joint Stipulation as a supplement to the FSA and approving the Joint Stipulation.

The Application describes the work of Class Counsel, and by other attorneys in their law firms and by attorneys specializing in Indian Law and in Supreme Court litigation. Class Counsel are (1) Michael P. Gross of the M.P. Gross Law Firm, P.C. in Santa Fe, New Mexico; (2) C. Bryant Rogers of VanAmburg, Rogers, Yepa, Abeita, Gomez & Works, LLP in Santa Fe, New

Mexico; and (3) Lloyd B. Miller of Sonosky, Chambers, Sachse, Miller & Munson, LLP in Anchorage, Alaska. At the fairness hearing, Attorney Spencer Reid of Keleher & McLeod, P.A. in Albuquerque, New Mexico represented Class Counsel in connection with their Application.

No objections to the Application were filed. The Government, in its role as trustee for all tribes and tribal organizations, supports the requested fee and agrees that an award of 8.5% of the amount paid from the Judgment Fund as defined in the FSA is fair and reasonable under the totality of the circumstances. *See* FSA § IX.A.

The Court concludes that the requested attorneys' fee of 8.5% of the amount paid from the Judgment Fund as defined in the FSA is fair and reasonable. Hence, the Court will grant the Consent Motion for Final Approval and will approve the Application.

In accordance with Rules 52(a) and 54(d), the Court enters these FINDINGS OF FACT AND CONCLUSIONS OF LAW APPROVING THE FINAL SETTLEMENT AGREEMENT AND AWARDING ATTORNEYS' FEES AND COSTS. Fed. R. Civ. P. 52(a), 54(d)(2).

## BACKGROUND

### The Indian Self Determination and Education Assistance Act (ISDA)

Prior to the ISDA, the federal government directly provided educational and governmental services to the hundreds of federally recognized Indian tribes in the United States. In 1975, Congress, recognizing that the system impeded the progress of Indian people, enacted the ISDA, which is codified in 25 U.S.C. §§ 450 *et seq. See Ramah Navajo Chapter v. Salazar*, 644 F.3d 1054, 1057 (10th Cir. 2011), *aff'd*, 132 S.Ct. 2181 (2012). The ISDA authorizes Indian tribes to enter into self-determination contracts with the Secretary of the Department of the Interior (DOI), the Bureau of Indian Affairs (BIA), and other agencies to directly provide these services and to "assure maximum participation by tribes in the planning and administration of

federal services, programs, and activities for Indian communities." *Ramah Navajo Chapter v. Lujan*, 112 F.3d 1455, 1456–57 (10th Cir. 1997).

Under the amended ISDA, the contracting governmental agency is required to fund the programs by paying the amount the agency "would have otherwise provided for the operation of the programs or portions thereof for the period covered by any contract." *Id.* (citing 25 U.S.C. § 450j–1(a)(1)). Congress soon realized that funding an amount that the Secretary would have spent operating a given program did not cover many federally mandated costs the tribes incurred. *Ramah Navajo Chapter*, 644 F.3d at 1058 (citing S. Rep. No. 100-274, at 8 (1987) reprinted in 1988 U.S.C.C.A.N. at 2628). Thus, in 1988, Congress amended the ISDA to require full funding of contract support costs (CSC).

In the ISDA, CSC are defined as "an amount for the reasonable costs for activities which must be carried on by a tribal organization as a contractor to ensure compliance with the terms of the contract and prudent management. . . ." 25 U.S.C. § 450j-1(a)(2). Specifically, the BIA must reimburse CSC of each contracting tribal organization, "for reasonable and allowable costs of – (i) direct program expenses for the operation of the Federal program that is the subject of the contract, and (ii) any additional administrative or other expense related to the overhead incurred by the tribal contractor in connection with the operation of the Federal program, function, service, or activity pursuant to the contract[.]" 25 U.S.C. § 450j–1(a)(3)(A)(i) and (ii).

Basically, CSC are "administrative expenses." *Cherokee v. Leavitt*, 543 U.S. 631, 634–35 (2005). "Indirect" contract support costs (indirect CSC) are administrative costs that are shared among various contracted tribal programs and other tribal programs, such as legal, personnel, accounting, and financial support. "Direct" contract support costs (direct CSC or DCSC) are specific administrative and other costs that are associated with a particular BIA program under

5

contract, and are not part of the undifferentiated indirect cost pool supporting all tribal activities. DCSC include direct costs, such as the cost of workers' compensation insurance, which are not included in the amount that the BIA would have spent to operate a particular program under contract. *See generally,* Geoffrey D. Strommer & Stephen D. Osborne, *The History, Status, and Future of Tribal Self-Governance Under the Indian Self-Determination and Education Assistance Act*, 39 AM. INDIAN L. REV. 1, 49–52 (2014–15) (Strommer & Osborne) (describing CSC and effect of payment shortfalls on tribes with ISDA contracts). The ISDA also authorized tribal contractors to sue for the award of ISDA contracts in conformity with the statute, for money damages due to violations of the statute, and for breach of contract. 25 U.S.C. § 450m-1.

Despite the purpose of fully funding CSC, the ISDA states that entitlement to funding is "subject to the availability of appropriations." 25 U.S.C. §§ 450j(c)(1), 450j–1(b). The ISDA also provides that "the Secretary is not required to reduce funding for programs, projects, or activities serving a tribe or tribal organization under this [Act]." 25 U.S.C. § 450j–1(b). *See generally, Ramah*, 644 F.3d at 1058–59 (explaining ISDA statutory history and funding shortfalls).

In fiscal year 1994, Congress began using these ISDA provisions to "cap" the amount of appropriated funds the BIA could use to pay CSC. From fiscal year 1994 through fiscal year 2013, the capped appropriations were insufficient to pay tribal contractors' CSC in full. *Id.* at 1057. Strommer & Osborne, at 50 (describing funding shortfalls and citing as an example the 2010 appropriations, which covered only 75.17% of tribes' ongoing CSC needs).

**This Class Action**

    **The Original Claims and PSA I**

In 1990, the Ramah Navajo Chapter (Ramah) brought this lawsuit against the United States of America, the Secretary of the Department of the Interior, and the Assistant Secretary, Indian Affairs (together, the Government). Ramah asserted two related claims that will be referred to as the "miscalculated rate claims." Ramah alleged that Defendants violated the ISDA through "system-wide underpayment of indirect costs to members of the class" resulting from a BIA policy "not to reimburse indirect costs it attributes to programs of other federal agencies outside of the U.S. Department of the Interior." NOTICE OF CLASS ACTION (Doc. No. 124). Ramah claimed that this BIA policy resulted in "reimbursement smaller than the amount . . . needed to operate the BIA's own programs." (*Id.* at 2.)  In the second claim, Ramah alleged that the "policy not to reimburse indirect cost shortfalls of other agencies [was] applied unevenly and . . . th[e] lack of uniformity violate[d] equal protection and due process guarantees of the Fifth Amendment of the United States Constitution." (*Id.* at 3.)

On October 1, 1993, the Court certified a Class of all tribes and tribal contractors that had BIA ISDA contracts, "who receive or are entitled to receive contract support funding based on indirect cost rates negotiated through the office of the inspector general." MEMORANDUM OPINION (Doc. No. 95). In the ORDER (Doc. No. 96), the Court broadened the definition of the Class to "include those Indian tribes and organizations who have contracted with the Secretary of the Interior under the Indian Self-Determination and Education Assistance Act."[2]

The Court granted summary judgment in favor of the Government on the miscalculated rate claims, finding that the BIA's method of calculating indirect cost rates conformed to the

---

[2] Class members were also notified "[i]f Plaintiff obtains recovery of damages for the class, a percentage of the fund thus created may be allocated for payment of attorneys' fees. Members of the class are not otherwise liable for payment of fees or costs." NOTICE (Doc. No. 124) at 2.

applicable statutes. The Tenth Circuit, however, reversed this holding and remanded for further proceedings. *Ramah Navajo Chapter v. Lujan*, 112 F.3d 1455 (10th Cir. 1997). The Tenth Circuit ruled that the ISDA required that the tribes "receive full funding for all reasonable contract support costs associated with self-determination contracts." *Id.* at 1463. The Tenth Circuit further determined that "defendants unreasonably interpreted the [ISDA] by applying the pre-amendment indirect costs formula to determine the amount of indirect costs funding plaintiff would receive for fiscal year 1989." *Id.* As a result, "defendants effectively and knowingly reduced the amount of funding they would provide to plaintiff to cover the indirect costs pool and thereby deprived plaintiff of full indirect costs funding for fiscal year 1989." *Id.*

After the Tenth Circuit's ruling, the parties entered into the First Partial Settlement Agreement (PSA I). In PSA I, the parties settled the miscalculated rate claims of 320 tribes and tribal organizations for fiscal years 1989 through 1993, and the parties agreed to an award of $76,200,000 in damages to those tribes and tribal organizations. *See Ramah Navajo Chapter v. Babbitt*, 50 F. Supp. 2d 1091, 1095 (D.N.M. 1999) (finding that PSA I was fair, reasonable, and adequate) (*Ramah I*). The Court concluded that PSA I was reasonable because the "damages questions on remand from the Tenth Circuit are complex, subject to differing, reasonable interpretations and therefore not amenable to simple or quick resolution." *Id.* at 1101. In *Ramah I*, the Court also approved the award of attorneys' fees to Class Counsel in the amount of 11%[3] of the settlement amount or "common fund," which equaled $8,338,000, plus post-judgment interest, plus applicable New Mexico Gross Receipts Taxes. In addition, the Court awarded $170,036.37 as reimbursement for costs incurred by Class Counsel. *Id.*

---

[3] Class Counsel had requested an award of 12.5% of the common fund, which the Court reduced to 11%. *See* 50 F. Supp. 2d at 1106 ("it is the Court's judgment that 11% of the Gross Common Fund less pre-judgment interest is a more reasonable award in light of all the circumstances and the Court's own application of the *Johnson* factors.").

**The Second Tier Shortfall Claim and DCSC Claim and PSA II**

On September 30, 1999, the Court allowed the Class to amend the complaint to add additional Class "shortfall claims" for "indirect costs from the commencement of Fiscal Year 1994 forward, the so-called second tier claim for that period." STIPULATED ORDER ALLOWING INTERVENTION AND AMENDMENT OF THE AMENDED COMPLAINT (Doc. No. 347). The Court also allowed the Oglala Sioux Tribe (Oglala) to intervene, assert a shortfall claim, and serve as a class representative. *Id.* The Court then allowed the Pueblo of Zuni to intervene as a class representative and to assert a new Class claim, originally filed as a separate case by the Pueblo of Zuni (Zuni),[4] for unpaid direct contract support costs (DCSC) under 25 U.S.C. § 450j–1(a)(2), (3) & (5). *Id.*[5] The Court granted Ramah's April 2001 motion to amend its complaint to add a third Class claim for DCSC[6] and directed Ramah to send notice of the new claim to the Class.[7]

On December 6, 2002, the Court approved of the parties' Second Partial Settlement Agreement (PSA II), which resolved the shortfall claims for fiscal years 1989–93 and the DCSC claims for fiscal years 1989–94, and awarded damages in the amount of $29,000,000 to approximately 224 Class members. *Ramah Navajo Chapter v. Norton*, 250 F. Supp. 2d 1303 (D.N.M. 2002) (Doc. No. 730) (*Ramah II*). In PSA II, the parties reserved for future litigation (1) all claims for unpaid indirect CSC for fiscal years 1994 forward, (2) all claims for DCSC for fiscal years 1995 forward, and (3) all claims for equitable relief. In *Ramah II*, the Court awarded as attorneys' fees 20% of the total settlement amount or common fund, plus New Mexico Gross

---

[4] *See Pueblo of Zuni v. United States*, Case No. 01 CV 1046 LH.
[5] STIPULATED ORDER GRANTING PUEBLO OF ZUNI'S MOTION TO INTERVENE AND CERTIFYING A NEW CLASS CLAIM (Doc. No. 633).
[6] STIPULATED ORDER GRANTING RAMAH NAVAJO CHAPTER'S MOTION TO AMEND COMPLAINT TO ADD NEW CLASS CLAIM AND DIRECTING NOTICE TO THE CLASS (Doc. No. 634).
[7] This order also incorporated the definition of the Class from the October 1, 1993 order: "those Indian tribes and organizations which have contracted with the Secretary of the Interior under the Indian Self-Determination and Education Assistance Act." (Doc. No. 634 at 1; Doc. No. 96.)

Receipts Taxes. The Court also awarded Class Counsel reimbursement of costs in the amount of $243,496.07.

### PSA III: Injunctive Relief

On August 27, 2008, the Court approved the Third Partial Settlement Agreement (PSA III), in which the Government agreed to change its indirect cost rate-making practices, and the parties agreed that all claims for equitable relief would be dismissed with prejudice.[8] Importantly, PSA III reserved all Class claims to money damages not settled in PSA I and PSA II. The reserved claims were described as "unsettled cap year claims." *Id.* In addition, PSA III required the DOI or the BIA to consult Class members if either agency "seeks to amend or rescind the policy." *Id.* The Court also awarded Class Counsel attorneys' fees in the amount of $725,000, which was paid out of the undistributed funds held in the common fund created by the first two settlements.[9] The Court also awarded Class Counsel $17,873.00 as reimbursement for costs. *See* ORDER APPROVING ATTORNEYS' FEES (Doc. No. 1160) and ORDER APPROVING COSTS (Doc. No. 1161).

### FINDINGS OF FACT

1.      Beginning in 1994, the Government opposed all of Plaintiff's post-1994 claims for underpayments of CSC due to lack of sufficient appropriations from Congress. The Government relied on language in the ISDA and in each contract that the provision of funds for CSC was "subject to the availability of appropriations." 25 U.S.C. § 450j–1(b).[10] Each fiscal year between 1994 and 2013, Congress specifically capped the amount of appropriated funds that the BIA could use to pay tribes for CSC. For example, in fiscal year 2000, Congress appropriated

---

[8] ORDER APPROVING THE THIRD PARTIAL SETTLEMENT AGREEMENT (Doc. No. 1159).
[9] The amount equaled .64% of the total settlement funds awarded in the case.
[10] The Government's model contract stated "[s]ubject to the availability of appropriations, the Secretary shall make available to the Contractor the total amount specified in the annual funding agreement" between the Secretary and the tribe. 25 U.S.C. § 450*l*(c).

$1,670,444,000 to the BIA, of which, "not to exceed $120,229,000" was allocated for CSC.

*Salazar v. Ramah Navajo Chapter*, 132 S.Ct. 2181, 2187 (2012) (describing appropriations

caps). Therefore, during all settlement negotiations, the Government refused to discuss

settlement of the Class's post-1994 cap year claims. Until 2012, the United States' position

appeared reasonable because the majority of courts had ruled in favor of the Government on the

issue.[11]

### Road to the United States Supreme Court

2.      In 2001, following the close of discovery, the parties filed cross motions for

summary judgment on the cap year claims. Class Counsel argued that the Government was liable

under the Contract Disputes Act (CDA), 41 U.S.C. § 601 *et seq.* for full CSC payments despite

Congress's specific caps on the amount the BIA could spend on CSC. *See* Doc. No. 571. The

Government argued that it had paid to contractors all of the CSC funds that Congress had

appropriated for that purpose, and that the ISDA's "subject to the availability of appropriations"

clause relieved it of any further liability beyond those appropriated sums. Proceedings on the

cross motions for summary judgment, however, were suspended while the parties negotiated the

pre-1994 DCSC claims and while the Tenth Circuit, and then the Supreme Court, considered the

case of *Cherokee Nation of Okla. v. Leavitt*, 543 U.S. 631, 636–37 (2005) (addressing argument

---

[11] *See, e.g., Arctic Slope Native Ass'n v. Sebelius*, 629 F.3d 1296 (Fed. Cir. 2010) (holding that appropriations cap
shielded the government from liability for contract support cost underpayments) *vacated* 133 S.Ct. 22 (June 25,
2012); *Cherokee Nation of Okla. v. Thompson*, 311 F.3d 1054, 1063 (10th Cir. 2002) (affirming a finding that tribal
contract support costs were funded only to the extent those costs were covered by appropriations from Congress)
*rev'd* 543 U.S. 631 (2005); *Shoshone-Bannock Tribes of Fort Hall Reservation v. Sec'y, Dep't of Health & Human
Servs.*, 279 F.3d 660, 664 (9th Cir. 2002) (holding that tribe was not entitled to contract support costs funding
independently of whether Congress appropriated money to cover such costs); *Babbitt v. Oglala Sioux Tribal Pub.
Safety Dep't*, 194 F.3d 1374, 1379 (Fed. Cir. 1999) (finding that the BIA was not liable for additional contract
support costs because BIA's ability to bind government was "expressly conditioned on the availability of
appropriations[.]"). *Cf. Pueblo of Zuni v. United States*, 467 F. Supp. 2d 1099, 1103 (D.N.M. 2006) (noting that it is
"doubtful that the [Supreme Court's] holding in *Cherokee Nation* would have an effect on ISDA contract disputes
during statutory cap years. . . .").

that inadequate congressional appropriations limited the government's liability to pay under its contracts).

3.      The *Cherokee* case involved a related issue of CSC funding, which the tribes[12] argued should have been paid by the BIA's sister agency, the Indian Health Service (IHS). However, the *Cherokee* case did not involve the same type of specific appropriations caps.[13] In *Cherokee*, the Government conceded that although Congress appropriated to the IHS unrestricted funds sufficient to cover the claimants' CSC, the IHS spent the funds for other purposes. 543 U.S. 631, 641–42. Since a ruling adverse to the tribes in *Cherokee* would necessarily mean defeat for the Class in this case, the Court stayed its decision on the cross motions for summary judgment pending rulings by the circuit courts and then the Supreme Court. In 2005, the *Cherokee* tribes prevailed. The Supreme Court held that the IHS must compensate tribes for CSC

---

[12] Two tribes were involved in the case: the Cherokee Nation and the Shoshone-Paiute Tribe. However, the *Cherokee* case before the Supreme Court was a consolidated case. In the first case, the tribes submitted claims seeking payment from the Department of the Interior. After the Department denied their claims; the tribes brought a breach of contract action in the Eastern District of Oklahoma seeking $3.5 million (Shoshone-Paiute) and $3.4 million (Cherokee Nation). The District Court found against the tribes. *Cherokee Nation of Okla. v. United States,* 190 F. Supp. 2d 1248 (E.D. Okla. 2001). And the Tenth Circuit affirmed. 311 F.3d 1054 (2002). In the second case, the Cherokee Nation submitted claims to the Department of the Interior, which denied the claims. The Board of Contract Appeals reversed this ruling and ordered the Government to pay $8.5 million in damages. *Cherokee Nation of Okla.,* 1999-2 BCA ¶ 30,462, p. 150488, 1999 WL 440045. The Government appealed, and the Federal Circuit affirmed. *Thompson v. Cherokee Nation of Okla.,* 334 F.3d 1075 (Fed. Cir. 2003).

[13] The appropriations laws in the *Cherokee* case did not have the "not to exceed" language used in the appropriations laws applicable to this case. The *Cherokee* case involved appropriations for IHS in fiscal years 1996 and 1997. For fiscal year 1996, Congress appropriated $1.7 billion to the IHS, of which approximately $1.374 billion was unrestricted. Of that $1.374 billion, however, $7.5 million was to be "expended, for the Indian Self–Determination Fund, which shall be available for the transitional costs of initial or expanded tribal contracts, grants or cooperative agreements with the Indian Health Service under the provisions of the Indian Self–Determination Act." *Cherokee Nation of Okla. v. Thompson*, 311 F.3d 1054, 1058 (10th Cir. 2002) *rev'd* 543 U.S. 631 (2005) (citation omitted). For fiscal year 1997, Congress appropriated $1.8 billion, with $1.426 billion unrestricted and out of which, as in 1996, $7.5 million was allocated to the ISD Fund for new or expanded contracts under the ISDA. *Id.* at 1059 (citation omitted). However, these appropriations bills did not expressly limit the amount of funds that could be spent on *ongoing* programs out of the lump-sum appropriation for CSC. Both designated $7.5 million to "remain available until expended" to pay for CSC for *new or expanded* contracts. *Id.* Nevertheless, in fiscal years 1996 and 1997, requests for CSC for new and expanded contracts exceeded the $7.5 million allocated. As a result, full CSC funding for such new and expanded contracts was delayed or not paid at all for some tribes. Additionally, the plaintiffs alleged that CSC funding for their ongoing contracts was inadequate. *Id.* The Cherokee Nation claimed that it was not paid $3.4 million in CSC for fiscal year 1997. *Id.*

12

if Congress appropriated sufficient unrestricted funds, known as "lump sum" appropriations. *Id.* at 647.

4.      Mr. Miller was lead counsel for the tribes in *Cherokee*, and Mr. Gross and Mr. Rogers filed *amicus* briefs in the Supreme Court on behalf of this Class. Lloyd Miller Aff. ¶ 9; Gross Aff. ¶ 62; and Rogers Aff. ¶ 31. The *amicus* briefs asked the Supreme Court to focus on case law that ultimately guided the Supreme Court's 2012 decision in this case.[14] The plaintiffs and *amici* centered their arguments on a late nineteenth century case *Ferris v. United States*, 27 Ct. Cl. 542 (1892). In *Ferris*, the Federal Court of Claims held that "[a] contractor who is one of several persons to be paid out of an appropriation is not chargeable with knowledge of [the appropriations'] administration, nor can his legal rights be affected or impaired by its maladministration or by its diversion, whether legal or illegal, to other objects." *Id.* at 546. The Supreme Court in *Cherokee* acknowledged the *Ferris* rule, and held that the government's promise to pay CSC was legally binding regardless of Congress' earmarked appropriation of insufficient funds—as long as Congress appropriated sufficient unrestricted funds to pay CSC in full. *Id.* at 637.

5.      In August 2006 after the Supreme Court ruling in *Cherokee*, this Court nevertheless granted summary judgment in favor of Defendants. MEMORANDUM OPINION AND ORDER (Doc. No. 1042) at 3, 11. The Court noted that the *Cherokee* case involved a different funding scheme. The Court observed that, in this case, there were specific "legal restrictions in the [BIA's] appropriations, [and] the 'subject to the availability of appropriations' language serve[d] to limit the governmental liability under the contracts to the amount of those restricted funds." *Id.* at 13. The Court continued, "an agency and a contracting party can

---

[14] In the majority opinion in *Salazar v. Ramah Navajo Chapter*, 132 S.Ct. 2181 (2012), Justice Sonia M. Sotomayor concluded, "[t]he principles underlying *Cherokee Nation* and *Ferris* dictate the result in this case." 132 S.Ct. at 2190.

negotiate a contract prior to the beginning of a fiscal year but . . . the contract will not become

*binding* unless and until Congress appropriates funds for that year." *Id.* at 14 (citing *Cherokee*,

543 U.S. at 643) (emphasis in original).

6.      Plaintiffs appealed the Court's ruling to the Tenth Circuit. *Ramah Navajo Chapter*

*v. Salazar*, 644 F.3d 1054 (10th Cir. 2011). In the Tenth Circuit, the Government argued that this

Court correctly interpreted the phrase "subject to the availability of appropriations" as limiting

the Government's obligation to pay CSC unless Congress appropriates funds to pay *all* contract

support costs on *every* self-determination contract. *Id.* at 1057. A majority of the Tenth Circuit

panel, however, disagreed. The majority ruled that even though the BIA received insufficient

appropriations to fund all ISDA contracts, the "subject to the availability of appropriations"

clause was satisfied with respect to ISDA contracts when Congress appropriated enough funds to

pay contract support costs on any individual contract. *Id.* In other words, the appropriations caps

limited the amount the BIA may distribute to tribes, but did not excuse the nonpayment or

underpayment of any single contractor's CSC as long as the appropriation was enough to cover

that individual contract. The Tenth Circuit's decision created a split between it and other circuit

courts on the issue. *See supra* note 11.

7.      Defendants appealed the Tenth Circuit's ruling to the United States Supreme

Court, and, despite Class Counsels' opposition, the Supreme Court granted *certiorari* to resolve

the circuit split. *Salazar v. Ramah Navajo Chapter*, 132 S.Ct. 995 (Jan. 6, 2012). In a 5 to 4

decision, the Supreme Court upheld the Tenth Circuit's ruling. *Salazar v. Ramah Navajo*

*Chapter*, 132 S.Ct. 2181 (2012).[15] The Supreme Court built on the foundation laid in *Cherokee*

and *Ferris*, and reasoned that even though Congress had limited an appropriation for CSC, the

---

[15] The majority opinion, authored by Justice Sonya Sotomayor and joined by Justices Scalia, Kennedy, Thomas, and Kagan, began by summarizing the *Cherokee* decision and stressing that ISDA contracts are as binding as any other contracts. *Id.* at 2188.

BIA was still liable to all tribal contractors for all CSC because Congress had appropriated enough funds to pay any one tribal contractor all of its CSC. On the basis of the holding in *Cherokee*, the Supreme Court noted that the Government's contractual obligation should be treated as an ordinary contract promise, and the language "subject to the availability of appropriations" did not alter the Government's statutory and contractual obligation to pay tribal contractors' CSC in full. 132 S.Ct. at 2188 (citing *Cherokee*, 543 U.S. at 638). On a practical level, the Supreme Court seemed unworried about the BIA's lack of funding, and stated, "[a]lthough the agency itself cannot disburse funds beyond those appropriated to it, the Government's 'valid obligations will remain enforceable in the courts.'" *Id.* (citing 2 GAO, *Principles of Federal Appropriations Law*, p. 6–17 (2d ed. 1992)).

       8.      As part of the *Ramah* case strategy in the Supreme Court, Class Counsel solicited *amicus* briefs from the United States Chamber of Commerce and the National Defense Industrial Association (NDIA). Both of those organizations had an interest in the development of government contracting law. In addition, Mr. Miller filed a separate *amicus* brief in *Ramah* on behalf of his client, the unsuccessful appellant in *Arctic Slope*, to overturn the ruling by the Federal Circuit. *See Arctic Slope Native Ass'n v. Sebelius*, 629 F.3d 1296 (Fed. Cir. 2010) (holding that appropriations cap shielded the government from liability for contract support cost underpayments) *vacated* 133 S.Ct. 22 (June 25, 2012).[16] Finally, Class Counsel solicited an *amicus* brief from the National Congress of American Indians (NCAI) detailing the history of BIA misconduct in its dealings with tribes under the ISDA. NCAI's *amicus* brief dispelled the

---

[16] Although the *Ramah* decision only directly applied to the BIA, the Supreme Court vacated the Federal Circuit decision in *Arctic Slope. See Arctic Slope Native Ass'n v. Sebelius*, 629 F.3d 1296 (Fed. Cir. 2010) *vacated*, 133 S.Ct. 22 (2012). On remand, the Federal Circuit followed *Ramah*, noted that the IHS's appropriations cap language was nearly identical to the BIA's, and held that the IHS was obligated to pay the Arctic Slope Native Association's full CSC.

notion that the BIA was a well-intentioned agency doing its best to honor tribal contracting rights despite insufficient funding.

**Settlement Negotiations: The Measure of Damages**

9.      The effect of Plaintiffs' 2012 victory in the Supreme Court was monumental. As maintained by Class Counsel since 1994, the appropriations caps did not excuse the Government's failure to pay the full CSC. Consequently, the Government faced a potential liability for breaching tens of thousands of ISDA contracts over more than 20 years of contracting. Hundreds of millions of dollars in damages were at stake.

10.      Although the Supreme Court ruled that the Government was liable for years of CSC underpayments, the Supreme Court did not advise the parties on exactly how to measure the damages. The parties were placed back almost to the beginning of the lawsuit, and they began another intense round of settlement negotiations, which lasted three and one-half years. Class Counsel, the Class Representatives, and Government counsel had 24 in-person meetings in various locations including Washington, D.C., Albuquerque, New Mexico, and Los Angeles, California. They engaged in countless telephone conferences and exchanged hundreds of email messages. The parties retained auditing and statistical experts to assist them in the complex task of valuing the Class claims.

11.      Officials from the named Class Representatives, Ramah Navajo Chapter, Oglala Sioux Tribe, and the Pueblo of Zuni participated in all of the settlement negotiations and were present at all of the settlement meetings. They were regularly consulted throughout the settlement negotiation period, and they added their expertise to the settlement negotiations. Officials of the Class Representatives attended the hearings on September 23, 2015 and January 20, 2016.

16

12.     The parties began the settlement discussions facing a fundamental procedural challenge of determining the correct method to calculate damages on a class-wide basis. Class Counsel initially proposed that the parties use the BIA's periodic "shortfall" reports submitted to Congress that outlined the BIA's own calculations of payment shortfalls to tribal contractors each year. The Government countered with the demand that damages be determined on a contract-by-contract basis. With over 645 Class members and twenty years of contractual underpayments, that procedure would have required a review of at least 12,000 "contract years." A "contract year" refers to a contract of a single contractor for one year, the typical duration for this type of contract. Many Class members had multiple contracts each year. Under the Government's suggested approach, the number of contracts to be reviewed and the related payment information to be considered involved an enormous volume of documents and data. It is not an exaggeration to say that this process would have taken several months, if not years.

**Sampling Process: Choosing Contracts to Review**

13.     Initially, the parties chose a small number of contract years to get a sense of the analysis required if the parties were to use the Government's preferred method of calculating damages. This effort consumed months. Although it was somewhat helpful, this pilot project magnified many problems and conflicts over the appropriate measure of damages.

14.     The parties reached a procedural compromise under which they would choose a statistical sampling of contract years. The results of the statistical sampling would then be extrapolated into the full Class over the twenty year period to calculate a total amount of damages. However, the parties could not agree on how the statistical sampling would be done. The parties hired expert statisticians who spent months designing a valid sampling method to

produce an accurate sample of contract years. Ultimately, the parties agreed to sample 108 contract years.[17]

15.     The sampling process was burdened with disagreements over the method of computing damages based on different views of contracting law. The tribes maintained that damages should be assessed on ISDA contracts as fixed-price contracts, with CSC established by a fixed formula. In contrast, the Government argued that the damages should be calculated as if the ISDA contracts were cost-reimbursable contracts, requiring an assessment of actual costs incurred by each contractor. Each side hired accounting experts to assist with the calculations of underpayment for each sampled contract. Once the sampled contracts were chosen, each contractor had to submit detailed financial data to support claims of unpaid CSC. Problems arose when some entities had insufficient documentation, especially for contracts executed several years prior. In addition to the documents and information produced by the sampled tribes, the Government searched its own archives located in Lenexa, Kansas and at BIA regional offices throughout the United States. The parties exchanged all information and documents in an informal discovery process. The tribes who participated in the sampling process incurred substantial expenses that will be reimbursed under the terms of the FSA.

16.     Another area of contention involved determining which contracts were eligible for CSC because agencies other than the BIA had contracted under the ISDA with tribes, and those agencies' contracts were arguably eligible for CSC payments. The parties also disputed how to calculate the indirect cost component of CSC. These issues required the attention of Class Counsel and Government counsel, and involved analyses by accountants and auditors on each side. The parties faced other contentious issues, such as whether Plaintiffs were entitled to pre-

---

[17] To be clear, when the Court refers to "108 contract years," it means that 108 one-year contracts were to be chosen for the sampling.

judgment interest, and how much pre-judgment interest was due. For more than a year and a half, the statisticians and the two principal accounting firms, one for the Class and one for the Government, communicated extensively about the many issues that arose. Documents from one tribal contractor were often not in the same form as documents from other contractors, and some sampled contractors could not locate all relevant documents. Class Counsel participated in resolving every issue. As anticipated, each side's analysis of the statistical sampling produced different estimates of damages.

17.     Prior to a scheduled status conference with Chief Magistrate Judge Molzen, in September, 2014, Class Counsel made a global settlement offer. The parties filed a Joint Status Report detailing the ongoing sampling efforts. *See* Doc. No. 1279. Class Counsel described the parties' limited analysis of only 38 of the proposed 108 sample contracts. In addition, the parties outlined their ongoing dispute over whether to use the Government's own records and statistics regarding annual CSC shortfalls. The Government also contended that the BIA's calculations of unpaid CSC were not an accurate measure of damages because these calculations were used for budget purposes and did not represent an assessment of the amount of actual shortfall for CSC due to contractors. For its part, the Government advocated for a larger sampling pool to achieve a smaller margin of error in the extrapolated results. Prior to the September status conference, Class Counsel submitted a settlement offer containing a statement that the Class was amenable to mediation. This submission "led Chief Magistrate Judge Molzen to take an aggressive and active role in the settlement discussions and to force the parties into mediation." Clerk's Minutes (Doc. No. 1280). After considering the parties' arguments, Chief Magistrate Judge Molzen directed the parties to discontinue statistical sampling after two more months. Chief Magistrate Judge Molzen also ordered the parties to attend a settlement conference in December 2014, and she required the

Government to bring Assistant Secretary for Indian Affairs Kevin Washburn to the settlement conference. In addition, Chief Magistrate Judge Molzen ordered the parties to engage in negotiations prior to the settlement conference and to submit detailed settlement statements to her office.. *See* Doc. No. 1281.

18.     On December 15 and 16, 2014, Chief Magistrate Judge Molzen held a settlement conference in Albuquerque, New Mexico. In advance of the conference, Class Counsel submitted a 35-page settlement statement with 10 supporting exhibits including expert reports. Class Counsel had also sent an 18-page letter to Assistant Secretary Washburn outlining Class Counsel's position on the settlement process and urging him to promptly settle this case. At the conclusion of the two-day settlement conference, the parties agreed in principle to settle the case for a total of $940,000,000.

### Collateral Benefit: Congressional Appropriations

19.     The Supreme Court's ruling led to more than a monetary settlement. After the 2012 ruling, Congress eliminated the caps in annual appropriations legislation and began fully paying all CSC. In the years since fiscal year 2014, tribal contractors have received hundreds of millions of dollars in increased CSC payments, an ongoing valuable benefit from this case.[18]

### Settlement Avoids a Difficult and Complex Trial

20.     A trial on damages would be incredibly complex. A trial would require a significant amount of judicial time and party resources. A trial would necessitate expert statisticians and accountants explaining arcane financial information and voluminous data from

---

[18] At the September 23, 2015 hearing on preliminary approval of the FSA, Class Counsel Mr. Gross estimated that Congress had appropriated at least an additional $300 million in funds to pay CSC on ISDA contracts. In the Application, Class Counsel state that the additional appropriations amounted to $786,831,000 for the fiscal years after the Plaintiffs' 2012 Supreme Court victory.

the parties' records. Obviously, a trial would result in counsel and the parties expending an enormous number of additional hours to prepare for and to try the issues.

22.     Class members have suffered over two decades of underpayments for CSC that they had to cover by taking funds from other areas of their cash-strapped budgets.

**Settlement Administration and Notice**

23.     The Court has approved the appointment of a Settlement Administrator who will manage the allocation and distribution of the Net Settlement Amount, as provided in the FSA. *See* ORDER GRANTING UNOPPOSED MOTION FOR APPROVAL OF CLASS COUNSEL'S ENGAGEMENT OF KCC/GALARDI & CO., LLC AS SETTLEMENT ADMINISTRATOR (Doc. No. 1332). The Settlement Administrator will issue reports and a final accounting of the distribution, as provided in the FSA. The Court will also approve the appointment of a Class Monitor, an independent Certified Public Accountant, who will independently review and confirm or correct the work of the Settlement Administrator. The Class Monitor will determine the accuracy of the Settlement Administrator's calculation of each Class member's share, before any payments are made to Class members. The Class Monitor will verify each claim form submitted, and the Class Monitor will have access to all pertinent records of the Settlement Administrator necessary to perform the Class Monitor's function. The costs of both the Settlement Administrator and the Class Monitor will be paid out of a reserve account, as provided in the FSA.

24.     The FSA also provides for the payment of attorneys' fees for Class Counsel in the amount of 8.5% of the common fund created under the FSA. The common fund is defined as the

Settlement Amount in the FSA.[19] In addition, the FSA provides for the reimbursement of all reasonable costs incurred by Class Counsel out of the Settlement Amount. FSA § IX. A.

25.     Class Counsel has properly provided notice of the FSA to the Class members as required by the FSA. *See* Doc. Nos. 1317, 1319, 1321, and 1330 (notices and affidavits of mailing and publication of Notice to Class members). In addition, Class Counsel posted the FSA on the NCAI's website and sent a description of the settlement to the NCAI's email distribution list. Class Counsel made in-person presentations of the settlement to the NCAI's annual convention, the quarterly meeting of the DOI Self-Governance Advisory Committee, the Great Plains Tribal Chairman's Association, and the Navajo Nation. In September 2015, Class Counsel participated in a joint press conference with Assistant Secretary of the Interior for Indian Affairs Kevin Washburn. After the press conference, numerous news articles about the settlement were published and stories about the settlement aired on television and radio stations.

26.     Notice of the settlement given to Class members was adequate, consistent with due process, and met the requirements of Fed. R. Civ. P. 23(e)(1). No Class member has requested exclusion from the settlement. Other than the USET response described above, no Class member has submitted an objection to the settlement.

**Mr. Gross**

27.     As primary Class Counsel, Mr. Gross, an attorney in private practice in Santa Fe, New Mexico, had overall responsibility for the case from its inception. He participated as lead counsel in the three previous settlements. Mr. Gross has devoted his professional life to the representation of Native American interests since 1968. (*See* Gross Aff. (Doc. No. 1313-1) ¶¶ 2,

---

[19] From the Settlement Amount of $940,000,000, the following amounts are to be deducted: (1) four million dollars deposited into a Reserve Account to pay for costs associated with distribution; and (2) the amount for attorneys' fees and costs awarded by this Court. The amount available for distribution after these amounts are deducted is defined as the Net Settlement Amount in the FSA. The New Mexico Gross Receipts Taxes on the attorneys' fees will be paid according to the Joint Stipulation.

5, 10, 12, 15–20, 26–27, 28–29, 33–36.) The 2012 victory in the Supreme Court resulted from Mr. Gross' intrepid efforts in the face of overwhelming odds after the majority of courts had denied claims similar to those of his clients.[20]

28.     Mr. Gross developed the ingenious strategy of seeking *amicus* support from the United States Chamber of Commerce and the NDIA, both of which had a stake in the Government honoring its contractual promises.

29.     After the Government filed a petition for *certiorari* review in the Supreme Court, Mr. Gross and Co-Class Counsel engaged an experienced attorney, Carter Phillips with the Sidley Austin firm, to represent the Class in the Supreme Court. Class Counsel worked with Mr. Phillips on all briefing and on preparation for oral argument in the Supreme Court. Mr. Phillips used his expertise and familiarity with the Supreme Court, including his experience working on the *Cherokee* case, to successfully persuade a majority of Justices on the Supreme Court to rule in favor of the Class. Mr. Phillips' fees are accounted for in the Application.

30.     Behind Mr. Gross's tireless advocacy is his knowledge that the tribes experienced "a crisis in Indian health care and education" and that "the promise of self-determination had been fulfilled haphazardly at best." (*Id.* ¶ 43.) His unique historical perspective fueled his advocacy for this settlement. (*Id.* ¶¶ 43–44.)

31.     Mr. Gross described how, as a consequence of the 2012 Supreme Court decision, the BIA "proposed full funding of CSC in the annual appropriations for FY 2014, FY 2015, and FY 2016." (*Id.*) Mr. Gross viewed these incidental benefits of the 2012 victory to be at least as important as achieving the settlement award for past underpayments. (*Id.* ¶ 46.)

---

[20] Mr. Gross engaged two seasoned lawyers as "of counsel" to his firm. Since 2002, Daniel H. MacMeekin has assisted Mr. Gross in this case. Since November 2014, Mr. Paul Frye, an experienced Indian law expert, helped Mr. Gross in the settlement of this case. Compensation for their time is included in the percentage fee requested in the Application.

32.     Mr. Gross consulted with all attorneys and parties in preparing and presenting Plaintiffs' positions to both the mediator, Chief Magistrate Judge Molzen, and the opposing parties, including Assistant Secretary Kevin Washburn. Mr. Gross performed research and prepared position papers, briefs, and other documents. Mr. Gross attended all settlement negotiating sessions over a three and one-half year period. Mr. Gross, along with Mr. Miller and Mr. Rogers, worked with counsel for the Government to agree on a settlement amount at the two-day mediation with Chief Magistrate Judge Molzen.

33.     Prior to the mediation, Mr. Gross oversaw the activities of the statisticians and accounting experts in the arduous sampling process that produced a basis for the settlement amount. Mr. Gross helped prepare the FSA and accompanying documents and assisted in developing the distribution procedures outlined in the FSA.[21] Mr. Gross oversaw the engagement of the Settlement Administrator. He consulted with Co-Class Counsel and opposing counsel, clients, and additional counsel hired for the Supreme Court case. This required multiple email communications, innumerable telephone conferences, and dozens of personal meetings. Attending settlement conferences and meetings required many hours of travel and preparation. Mr. Gross estimated that the parties debated and discussed over 34 discreet issues during the three and one-half years of settlement negotiations. Tr. 6:1–6 (Doc. No. 1320).

34.     In 2014, due to the financial burdens of this case, Mr. Gross took out a loan in the amount of $350,000 secured by a mortgage on his Santa Fe residence to help defray the costs of experts and travel incurred in settlement negotiations.

---

[21] At the September 23, 2015 hearing, Mr. Rogers described the distribution procedure developed for the FSA as a vastly improved procedure from the one used in PSA I and PSA II. In the FSA, Appendix 2, each Class member's percentage of the settlement amount is set out. This avoids the long process of determining each Class member's share and the possibility a Class member would be excluded for failure to submit its claim in time. *See generally,* Tr. 32:6–33:24 (Doc. No. 1320).

**Mr. Rogers**

35.     After graduating from law school in 1977 and prior to going into private practice in Santa Fe, New Mexico in 1981, Mr. Rogers worked at the Oglala Sioux Tribal Court and the Indian Pueblo Legal Services. Mr. Rogers also administered a legal services program on the Mississippi Choctaw Reservation. In his private practice, Mr. Rogers represented tribal organizations in contract disputes and taxation disputes with local, state, tribal, and federal governments.[22]

36.     Mr. Rogers worked with staff for the United States Senate Select Committee on Indian Affairs to draft and secure enactment of 25 U.S.C. § 450m-1, the provision of the ISDA that gives tribal contractors a judicial remedy for contract disputes involving injunctive as well as monetary relief. This statutory provision made this class action possible. Mr. Rogers has a special expertise in the complex area of calculating ISDA CSC and in "how the systems involved in generating indirect cost rates and amounts via fixed carry-forward rate and provisional-final rate methodologies operate, and how those operations impact tribal ISDA contractors' rights to receive full indirect costs under the ISDA." (*See* Miller Aff. (Doc. No. 1313-11) ¶ 17–19.)

37.     Mr. Rogers performed an essential role in achieving the settlement reflected in the FSA by "demonstrating to the government that none of the existing indirect cost rate systems or methodologies enabled tribal contractors to recoup the kind of indirect cost (or DCSC) underpayments on which the Class sought damages on the CAP year claims in this action." (*Id.* ¶ 21.) His special knowledge and expertise in this area was critically important in the settlement negotiations.

---

[22] As described by Mr. Gross and Mr. Rogers, tribal contract law is a legal specialty in which few lawyers in the United States are proficient.

38.     Mr. Rogers, along with Mr. Gross, filed *amicus* briefs in support of tribal contractors in numerous cases that helped achieve the positive ruling in the Tenth Circuit and later the Supreme Court in this case. On behalf of the Class in this case, Mr. Rogers filed *amicus* briefs in the Tenth Circuit, the Federal Circuit, and the Supreme Court in the *Cherokee* case. *See Cherokee Nation v. Thompson*, 311 F.3d 1054 (10th Cir. 2002) (*amicus* brief in favor of Appellant Tribe); *Thompson v. Cherokee Nation of Oklahoma*, 344 F.3d 1075 (Fed. Cir. 2003) (*amicus* brief filed in support of Tribe); and *Cherokee Nation v. Leavitt*, 543 U.S. 631 (2005) (same). The ruling by the Supreme Court in *Cherokee Nation v. Leavitt*, was a stepping stone to the Class's victory before the Tenth Circuit and the Supreme Court.

39.     Mr. Rogers assisted in the settlement negotiations by adding his expertise to the process of determining the appropriate method to calculate an amount of damages, which led to the settlement after mediation. He attended all settlement negotiating sessions.

40.     During settlement negotiations, Mr. Rogers was instrumental in the development of the statistical sampling method and the distribution methodology set forth in the FSA. In addition to participating in the formulation of the statistical sampling plan, Mr. Rogers assisted in devising a method to analyze the complex CSC system as applied to each sampled contract year. He helped collect the necessary documents from the sampled contracts, applied the methodology to each contract, and estimated the Class's total CSC shortfalls. (Miller Aff. ¶ 41.) This process was not completed until December 2014, after being accelerated by a time limit imposed by Chief Magistrate Judge Molzen at a status conference earlier that fall. The results of the accelerated sampling process were the primary reason for the successful mediation in December 2014 that produced the settlement amount.

41.     Mr. Rogers was deeply involved in evaluating arguments presented by the Class on the cap year claims from the time of the summary judgment in 2001. Mr. Rogers was actively involved in all informal discovery with Government counsel, experts, and accountants. He performed extensive data analysis. (*Id.* ¶ 43.)

42.     Mr. Rogers took the lead on working with the accounting experts in "framing the Class position on individual sample tribe CSC need calculation methodologies and options, and for translating between the Class' accountants and the Class' legal team, between the Class' statistician and the Class' legal team, and between the Class' accountants and the Class' statistician." (*Id.* ¶ 44.) This work involved "analy[zing] data, addressing differences in the data, sampling, claims calculation methodologies and audit conclusions of the government accountants and the Class' accountants and as between the government statisticians and the Class' statistician." (*Id.*) Mr. Rogers affirmed that he, Mr. Gross, and Mr. Miller are among the "[v]ery few attorneys and accountants [who] actually understand the complexities underlying the government's carry forward templates and methodologies." (*Id.* ¶ 45.) This expertise was critical to the settlement. Mr. Rogers was also intimately involved in the seven-month process of formulating and drafting the FSA. (*Id.* ¶ 53.)

**Mr. Miller**

43.     Mr. Miller has practiced law since 1979 with the firm of Sonosky, Chambers, Endreson & Perry, LLP that has offices in Washington, D.C., Anchorage, Alaska, and Albuquerque, New Mexico. (Miller Aff. (Doc. No. 1313-28) ¶¶ 1–3.) His practice is devoted to representing the interests of Tribes and tribal organizations focusing on matters relating to the ISDA. (*Id.* ¶¶ 3, 7–8.) He has been involved in the ISDA legislative process and was

instrumental in achieving amendments to the ISDA in 1988, 1990, 1994, and 2000. He frequently testified before Congress on the issue of CSC. (*Id.* ¶ 7.)

44.     In April 2002, Mr. Miller, as counsel for Zuni in *Pueblo of Zuni v. United States*, No. 00 CV 365 LH/WWD (D. N.M.), agreed to dismissal of that case based on a stipulation to merge Zuni's claims into this case and to have Zuni be the lead Class Representative on DCSC claims, in order "to present a more formidable joint case that would, hopefully, benefit all Tribes." (*Id.* ¶¶ 12, 24.) Mr. Miller contributed to the settlement in this case with work on cap year claims from the time he entered this case in 2002. (*Id.* ¶ 32.)[23]

45.     Mr. Miller represented the appellants in the *Cherokee* litigation. The *Cherokee* Supreme Court decision supported the rulings in favor of the Class in this case in both the Tenth Circuit and in the Supreme Court. In the *Cherokee* consolidated case, Mr. Miller developed a strategy that was also useful in this case at the Supreme Court level. He centered the legal argument on government contract law, particularly the *Ferris* doctrine. He solicited *amicus* briefs from the United States Chamber of Commerce, the NDIA, and the Aerospace Industries Association supporting the Tribes' position on government contracts law. (*Id.* ¶¶ 37–38.) After the *Cherokee* decision in 2005, this Court asked for supplemental briefing on the pending cross motions for summary judgment, and Mr. Miller assisted with the supplemental briefing. (*Id.* ¶ 39.)

46.     After this Court's ruling against the Class in 2006, Mr. Miller worked with Co-Class Counsel to wrap up the injunctive settlement agreement in 2008, to secure a final judgment, and to seek appellate review of the summary judgment ruling. (*Id.* ¶ 40.) In August

---

[23] The vast majority of the legal work by Mr. Miller and other attorneys in his firm was performed outside of the state of New Mexico, primarily in Washington, D.C. and Anchorage, Alaska. (Miller Aff. ¶ 15.)  As a result, Mr. Miller's and his firm's fees will not be subject to New Mexico Gross Receipts Taxes. Mr. Miller's firm obtained a ruling from the New Mexico Taxation and Revenue Department on this issue. (*Id.*)

2008, after a final judgment was entered, the decision to pursue an appeal that was "universally

considered extremely difficult to win," was a difficult one. (*Id.* ¶ 41.) As of 2008, every court

that had considered cap year claims had ruled against the contractors and for the government.

(*Id.*) Despite long odds, Class Counsel decided to appeal the Court's summary judgment ruling

to the Tenth Circuit with the belief that the *Cherokee* decision provided a solid basis for

prevailing on appeal. (*Id.* ¶ 42.)

47.     After opening briefs were filed, the Tenth Circuit assigned a mediator to explore

the possibility of settlement. (*Id.* ¶ 43.) During the mediation, the Federal Circuit decided the

case of *Artic Slope Native Ass'n v. Sebelius*, 629 F.3d 1296 (Fed. Cir. 2010), which was litigated

by Mr. Miller. As of 2010, the Federal Circuit decision in *Arctic Slope* was another setback for

the Class. (*Id.* ¶ 44.) After a round of supplemental briefing in the Tenth Circuit, the appellate

panel rendered a divided opinion and overruled this Court. (*Id.* ¶ 45.)

48.     Mr. Miller states that the "entire Supreme Court chapter of this litigation was an

extraordinarily massive and complicated enterprise[.]" (*Id.* ¶ 46.) There were two phases of this

chapter. First, there was the fight to avoid Supreme Court review of the Class's victory in the

Tenth Circuit. Class Counsel met with the Solicitor General in an effort to convince the

Government not to seek *certiorari*, and instead to consider settlement. (*Id.* ¶ 47.) However, the

Government succeeded on its petition. Class Counsel then hired a specialist, Carter Phillips, an

attorney with significant experience before the Supreme Court. Second, Class Counsel assisted in

the effort to maintain the Tenth Circuit victory by conducting extensive new research on

government contract law. This included archival research on key Supreme Court and Court of

Claims decisions and meticulous research of Congressional appropriations for the preceding 20

years. (*Id.* ¶ 48.) The *amicus* strategy helped focus the Plaintiffs' position more on government

contract law and less on the ISDA. (*Id.* ¶ 49.) Mr. Miller, on behalf of his client the Arctic Slope

Native Association, submitted an *amicus* brief in the Supreme Court. (*Id.* ¶ 50.) The *amicus* brief

focused on Arctic Slope's experience with the IHS, and argued that "taking the government's

argument to its logical conclusion would result in unpredictable and irrational payment regimes

no government contractor could possibly predict, much less rely upon. This proved pivotal too,

and at oral argument Justice Kagan asked pointed questions of government counsel based upon

facts laid out in [Mr. Miller's] Arctic Slope amicus brief." (*Id.*)

49.     After the Supreme Court victory, Mr. Miller assumed primary responsibility for

preparing a damages matrix based on the BIA's shortfall reports to Congress. (*Id.* ¶ 53.) This

effort enabled the Class to provide an estimate of damages that would be used to open settlement

discussions with the Government. (*Id.*) Over several months, Mr. Miller attended numerous

settlement meetings aimed at deciding how to perform the statistical sampling of contract years

to determine total damages. (*Id.* ¶ 57.) The parties did not reach agreement on a sampling plan

until the winter of 2013-14. (*Id.* ¶ 68.) Once the sampling plan was created, the parties had to

collect the documentation from sampled tribes, a process that was difficult and time-consuming.

(*Id.* ¶ 69.) Mr. Gross, Mr. Rogers, and Mr. Miller were very involved in determining the

underpayment amount once the documents were analyzed by the expert accountants. (*Id.* ¶ 70.)

Mr. Miller assisted in resolving many issues that arose during the sampling process. (*Id.* ¶¶ 72–

81.)

50.     By the summer of 2014, the parties had analyzed only a pilot sampling of 38

contract years, but the Government insisted on analyzing the total of 108 contract years before

settlement discussions could begin. (*Id.* ¶ 81.) Class Counsel, believing they had enough data to

extrapolate a damages amount, prepared and submitted a written settlement offer in September

2014. (*Id.*) Mr. Miller assisted with preparing this offer and the Joint Status Report that was presented to Chief Magistrate Judge Molzen at the first in-person status conference in September 2014. (*Id.* ¶ 82.) These actions, along with Class Counsel's invitation to mediate before Chief Magistrate Judge Molzen, proved to be critical turning points in the settlement process. (*Id.* ¶ 83.)

51.     After the settlement conference in December 2014, Mr. Miller, along with the expert statisticians, assisted in developing a method for distributing the funds to each Class member. (*Id.* ¶ 88.) Mr. Miller also participated in the drafting of the FSA, which was finalized after 20 drafts. (*Id.* ¶ 89.)

52.     Mr. Miller worked to ensure that CSC would be fully funded in future years. This involved Mr. Miller's participation in the contract support cost working group that advises the BIA on issues related to CSC; collaboration with various interest groups; work with the White House to press for full funding in its proposed budgets; and work with members of Congress on yearly appropriations bills. (*Id.* ¶ 90.) In his affidavit, Mr. Miller set forth a chart outlining the additional appropriations of funds for fiscal years, 2014, 2015, and 2016. He calculated that the Tribes received a total of $786,831,000 additional funding after Congress followed the 2012 Supreme Court mandate. (*Id.* ¶ 91.)

53.     Mr. Miller was keenly aware that this Class risked decertification, if the settlement were not achieved, because he had experienced a denial of class certification in the *Zuni* case. *See Pueblo of Zuni v. United States*, 243 F.R.D. 436 (D.N.M. 2007) (denying class certification for tribes who contracted with the IHS because class members did not all exhaust administrative remedies and because the Rule 23 requirements were not met).

31

**Professor Fitzpatrick**

54.      In support of a common fund fee of 8.5%, Class Counsel submitted the

Declaration of Professor Brian Fitzpatrick as an exhibit to the Consent Motion for Approval of

Attorneys' Fees. Professor Fitzpatrick is a law professor at Vanderbilt University and the author

of a widely-cited article on class action attorneys' fees. *See* Brian Fitzpatrick, *An Empirical*

*Study of Class Action Settlements and Their Fee Awards*, 7 J. Empirical L. Stud. 811 (2010).

Professor Fitzpatrick testified at the fairness hearing.

## CONCLUSIONS OF LAW

**Settlement is Fair, Reasonable, and Adequate**

1.      Under Fed. R. Civ. P. 23(e), "[t]he claims, issues, or defenses of a certified class

may be settled, voluntarily dismissed, or compromised only with the Court's approval." Rule 23

(e) also dictates that "the court may approve [a settlement agreement] only after a hearing, and

on finding that it is fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(2).

2.      In deciding whether to approve a class settlement, the Court considers whether

"(1) the settlement was fairly and honestly negotiated, (2) serious legal and factual questions

placed the litigation's outcome in doubt, (3) the immediate recovery was more valuable than the

mere possibility of a more favorable outcome after further litigation, and (4) [the parties]

believed the settlement was fair and reasonable." *Tennille v. Western Union Co.*, 785 F.3d 422,

343 (10th Cir. 2015) (quoting *Weinman v. Fid. Capital Appreciation Fund (In re Integra Realty*

*Res., Inc.)*, 354 F.3d 1246, 1266 (10th Cir.2004)).

3.      The settlement amount of $940,000,000 is fair, reasonable, and adequate in view

of the intricacy of the claims and the risks associated with litigation of the amount of damages

due to the hundreds of tribal contractors over a period of 20 years. One ever-present risk was the

possibility of class decertification given the complexity associated with a damages calculation.

The parties would have faced a long arduous process of gathering data from 699 Tribes and

presenting that data with the help of accounting and financial experts. The trial preparation and

presentation would most likely have taken months, if not years, and would have cost thousands,

if not hundreds of thousands of dollars. Finally, there is the risk that a jury's award might be

much less than the amount obtained in the settlement process.

4.      Settlement negotiations, both before and after Chief Magistrate Judge Molzen's

mediation, were at arm's length with the parties vigorously supporting their positions. Counsel

for both sides are experienced and capable lawyers whose recommendation of approval has been

given due weight. The settlement was fairly and honestly negotiated by counsel and the parties.

5.      Serious questions of law and fact exist, placing the ultimate outcome of this

litigation in doubt.

6.      The value of an immediate recovery outweighs the mere possibility of future

relief after protracted and expensive litigation.

7.      The parties agree that the settlement is fair and reasonable. The reaction of the

Class has been favorable as evidenced by affidavits submitted by each Class Representative and

by the absence of objections to the FSA. *See* NOTICE OF FILING OF PLAINTIFFS'

DECLARATIONS OF APPROVAL OF FINAL SETTLEMENT AGREEMENT (Doc. No.

1308). The only objection was filed by USET, and the objection was based on USET's exclusion

from the Class. *See* NOTICE OF INTENTION TO APPEAR AND OBJECT TO FINAL

SETTLEMENT AGREEMENT (Doc. No. 1324). As a result of USET's objection, 26 more

Tribes or tribal organizations have been added to the Class and found eligible for a share in the

settlement amount. *See* ORDER SUSTAINING IN PART AND OVERRULING IN PART THE

OBJECTION BY UNITED SOUTH AND EASTERN TRIBES, INC. AND DIRECTING

NOTICE TO BE SENT TO 26 NEWLY-IDENTIFIED CLASS MEMBERS (Doc. No. 1329).

8.      The Court has taken its role as fiduciary seriously and has carefully reviewed all of the available material prior to reaching this decision. The Court's concern about New Mexico Gross Receipts Taxes having a negative effect on the Class's final recovery led Class Counsel to enter into the Joint Stipulation. In the Joint Stipulation, Class Counsel, who have to pay New Mexico Gross Receipts Taxes on their fees, agreed to delay their request for reimbursement of New Mexico Gross Receipts Taxes until all other costs are paid from the Reserve Account. In addition, Class Counsel stipulated that to the extent the funds in the Reserve Account are insufficient to reimburse all New Mexico Gross Receipts Taxes, Class Counsel will waive any right to payment of the unreimbursed amount.

9.      The settlement amount awarded to each of the Class Representatives, Ramah, Oglala, and Zuni will include a 20% increase in their share of the damages. The Court concludes that this is fair and reasonable. The Class Representatives provided a valuable service in protecting the rights of all tribal contractors under the ISDA, they expended much time and effort over many years prosecuting this litigation, and they actively participated in all aspects of the financial and statistical analyses and in the negotiations that led to this historic settlement.

10.      The settlement amount of $940,000,000 is unprecedented in the District of New Mexico. The plan of distribution outlined in Parts VII and VIII of the FSA is fair and reasonable. The reimbursement of reasonable out-of-pocket costs to the tribal contractors who participated in the sampling exercise is appropriate because their efforts were essential in arriving at a settlement amount. The reimbursement of the reasonable out-of-pocket expenses, incurred by the

Class Representatives in participating in the litigation and the lengthy settlement process, is fair and reasonable.

11.     The issue of possible offset rights of the Treasury Debt Collection Authority is adequately addressed in the FSA and in the claims review process. The process also protects the privacy rights of the affected Class members.[24]

### Attorneys' Fees and Costs are reasonable

12.     "In a certified class action, the court may award reasonable attorney's fees and nontaxable costs that are authorized by law or by the parties' agreement." Fed. R. Civ. P. 23(h). This claim "must be made by motion under Rule 54(d)(2)," and notice of the motion must be "directed to class members in a reasonable manner," who may then "object to the motion." Fed. R. Civ. P. 23(h)(1)–(2). The court must also, "find the facts and state its legal conclusions under Rule 52(a)." Fed. R. Civ. P. 23(h)(3). In turn, Rule 52(a) requires that a claim for attorneys' fees be made by motion and specifies the motion's timing and content, including, in relevant part, "the grounds entitling the movant to the award" and "the amount sought." Fed. R. Civ. P. 52(a)(2)(B).

13.     "In class actions, the district court has broad authority over awards of attorneys' fees[.]" *Law v. Nat'l Collegiate Athletic Ass'n*, 4 Fed. App'x 749, 751 (10th Cir. 2001). Often, when a fund is created for the benefit of a class, either through settlement or a judgment, the common fund doctrine is used as a method for proportionately spreading payment of attorneys'

---

[24] In February 2015, Government counsel, James Todd, announced that the settlement proceeds would be subject to the Treasury Department's Offset program. 31 U.S.C. § 3716; 26 U.S.C. § 6331(h).  The Treasury Department indicated that even the portion of attorneys' fees attributable to a contractors' share of the settlement is subject to offset. In the interest of expediting settlement, Class Counsel, Mr. Gross, Mr. Miller, and Mr. Rogers have agreed to take the risk that their fees and possibly cost reimbursement might be reduced once the total amount of offset is determined.  This process is addressed in the FSA, which provides that the Settlement Amount will be direct deposited from the Treasury's Judgment Fund into a Designated Account established by Class Counsel. However, the amount deposited will be that portion of the total not subject to the Treasury offset program. Since attorneys' fees are calculated as 8.5% of the deposited settlement proceeds, attorneys' fees will necessarily be reduced. *See* FSA pp. 19–20.

fees among class members. *Tennille v. Western Union Co.*, No. 09 CV 00938, 2013 WL 6920449, *4 (D. Colo. Dec. 31, 2013) (Tafoya, M.J.), *adopted as modified*, *Tennille v. Western Union Co.*, 2014 WL 5394624, *4 (D. Colo. Oct. 15, 2014) (Kane, D.J.) (unreported decisions), *appeal dismissed*, 809 F.3d 555 (Nov. 17, 2015).

14.     In *Ramah I*, the Court recognized that "there are two generally accepted means for awarding attorneys' fees in class action suits, the so-called lodestar method—determining fees based on the hours worked and a reasonable hourly fee—and the percentage-of-the-fund method—awarding fees based on a reasonable percentage of the overall award." 50 F. Supp. 2d at 1095 (citing Alan Hirsch & Diane Sheehey, *Awarding Attorneys' Fees and Managing Fee Litigation* 63–67 (Federal Judicial Center 1994).

15.     The Tenth Circuit has stated, "[t]he award of attorneys' fees is based on substantially different underlying purposes in a common fund case than in a statutory fees case. The common fund doctrine 'rests on the perception that persons that obtain the benefit of a lawsuit without contributing to its costs are unjustly enriched at the successful litigant's expense.'" *Brown v. Phillips Petroleum Co.*, 838 F.2d 451, 454 (10th Cir. 1988) (quotation omitted). Thus, the percentage award results "in a sharing of the fees among those benefitted by the litigation." *Id.* In *Brown,* the Tenth Circuit directed that, in determining what percentage would be reasonable, courts should review the twelve factors articulated by the Fifth Circuit in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 717–19 (5th Cir. 1974). *Brown*, 838 F.2d at 454.

16.     The *Johnson* factors are:

> (1) the time and labor involved; (2) the novelty and difficulty of the questions; (3) the skill requisite to perform the legal service properly; (4) the preclusion of other employment by the attorney due to acceptance of the case; (5) the customary fee; (6) any prearranged fee–this is helpful but not determinative; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the undesirability of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases.

*Ramah*, 50 F. Supp. 2d at 1096 (quoting *Johnson*, 488 F.2d at 717–19). Significantly, this Court must perform its role as "'fiduciary for the beneficiaries' of the fund," *Brown*, 838 F.2d at 456 (quoting Report of the Third Circuit Task Force, *Court Awarded Attorney Fees*, 108 F.R.D. 237, 251 (1985)), in order to properly "determine a reasonable fee by weighing the appropriate interests of the beneficiaries in light of the efforts of counsel on their behalf." *Id.*

17.     The percentage of the fund method is "the appropriate means to determine a reasonable fee . . . a lodestar analysis would not be helpful in setting or even evaluating a reasonable percentage of the Common Fund." *See Ramah I*, 50 F. Supp. 2d at 1097. The Tenth Circuit has made it clear that district courts need not calculate a lodestar when applying the percentage method. *See Gottlieb v. Barry*, 43 F.3d 474, 487 (10th Cir. 1994) (holding that district court had abused its discretion by using the "lodestar plus multiplier method" in evaluating reasonable attorney's fees paid out of a settlement fund in a securities class action). The percentage approach is also more efficient. Importantly, it aligns the interests of class counsel with the interests of the class because the more the class recovers, the more class counsel recovers. The lodestar analysis, even when used as a cross check to determine a reasonable percentage award, has the effect of rewarding attorneys for the same undesirable activities that the percentage method was designed to discourage, namely "incentiviz[ing] [class counsel] to multiply filings and drag along proceedings to increase their lodestar." *See* Declaration of Brian T. Fitzpatrick (Doc. No. 1335-1) ¶¶ 10, 17–18, 24–27 (noting that the lodestar cross check

"reintroduces the very same undesirable effects of the lodestar method that the percentage method was supposed to correct in the first place." Hence, as the Court did in approving PSA I and PSA II, the Court will award a reasonable percentage of the fund as attorneys' fees without a lodestar analysis or cross check. *See Ramah Navajo Chapter v. Norton*, 250 F. Supp. 2d at 1316. The Court will instead evaluate the "*Johnson* factors—most significantly the novelty and difficulty of the questions, the skill required, and the custom of contingency fee arraignments [sic] in similar cases" because those factors "help the Court more accurately determine a reasonable percentage of the fund to award in attorneys' fees." *Ramah I*, 50 F. Supp. 2d at 1097.

### Percentage Method Without Lodestar Analysis

18.     The Court has previously held that in common fund cases attorneys' fees should be evaluated using the percentage of the fund method without a lodestar analysis. *Ramah I*, 50 F. Supp. 2d at 1108 (Conclusion of Law No. 13); *Ramah II*, 250 F. Supp. 2d at 1316 (Conclusion of Law No. 9). Other courts in the Tenth Circuit have awarded attorneys' fees under the percentage of the fund method without calculating the lodestar. *See, e.g., Fankhouser v. XTO Energy, Inc.*, 2012 WL 4867715, *3 (W.D. Okla. Oct. 12, 2012) (awarding 36% without lodestar cross check); *Droegemueller v. Petroleum Devel. Corp.*, 2009 WL 961539, *4 (D. Colo. Apr. 7, 2009) (awarding 33 1/3% without a lodestar cross check); *Lewis v. Wal-Mart Stores, Inc.*, 2006 WL 3505851, *2 (N.D. Okla. Dec. 4, 2006) (awarding 33 1/3% without calculating lodestar); *and Millsap v. McDonnell Douglas Corp.*, 2003 WL 21277124, *9 (N.D. Okla. May 28, 2003) (awarding 25% without lodestar calculation) (all cases unreported). The Court has expressly rejected the lodestar method because it is "difficult to apply, time-consuming to administer, inconsistent in result, and capable of manipulation to reach a predetermined result." 50 F. Supp. 2d at 1108. Thus, with a minor difference in light of the mega fund at issue here, the Court will

follow its previous rulings and award attorneys' fees using the percentage method without applying the lodestar analysis.

**Percentage in Cases Involving "Mega Funds"**

19.     Most Courts modify the analysis when the common fund is a "mega fund" recovery, currently defined as cases with common fund recovery of more than $100 million. *In re Copley Pharm., Inc.*, 1 F. Supp. 2d 1407, 1413 (D. Wyo. 1998). To avoid windfalls, Courts generally modify their analysis by awarding a lower percentage for mega fund cases. *Id. But see Allapattah Servs., Inc. v. Exxon Corp.*, 454 F. Supp. 2d 1185, 1213 (S.D. Fla. 2006) (finding that lowering percentage for mega fund awards is "antithetical to the percentage of the recovery method . . . the whole purpose of which is to align the interests of Class Counsel and the  Class by rewarding counsel in proportion to the result obtained."). In mega fund cases, courts in other districts have awarded between 10% and 15% of a mega fund. *See, e.g., Kifafi v. Hilton Hotels Ret. Plan*, 999 F. Supp. 2d 88, 104 (D.D.C. 2013) (awarding fee of 15% of $140 million fund); *Shaw v. Toshiba America Information Systems, Inc.*, 91 F. Supp. 2d 942, 972 (E.D. Tex. 2000) (finding that awards of 15% of mega fund were "common"); *In re NASDAQ Market-Makers Antitrust Litig.*, 187 F.R.D. 465 488 (S.D.N.Y. 1998) (awarding 14% fee out of $1.027 billion fund); and *Copley Pharm.*, 1 F. Supp. 2d at 1415 (awarding fee of 13% of $150 million fund). Some courts, however, have awarded percentage fees of more than 15% in mega fund cases. *See, e.g., Tennille v. Western Union Co.*, 2014 WL 5394624, *4 (awarding 30% of $180 million fund); and *Allapattah*, 454 F. Supp. 2d at 1204 (awarding fee of 31 1/3 % of a $1.075 billion fund). In comparison, the 8.5% requested in the Application is a conservative percentage.

20.     Each of the applicable *Johnson* factors supports the award of 8.5% of this common fund as attorneys' fees to Class Counsel.

21.     The first factor, the time and labor involved, supports an award of the requested

8.5% fee. Mr. Gross recorded 10,283.63 hours expended on the cap year claims, the settlement,

and the FSA.  Mr. Rogers spent 3,725.81 hours of work on the cap year claims, the settlement,

and the FSA. Mr. Miller worked 5204.04 hours on the cap year claims, the settlement, and FSA.

The work hours of Class Counsel total 19,213.48. However, as the Court recognized in both

*Ramah I*  and *Ramah II*, courts give less weight to the time and labor factor than given to "the

results obtained, the novelty and difficulty of the issues, and the skill of counsel. . . ." *Ramah II*,

250 F. Supp. 2d at 1316; *Ramah I*, 50 F. Supp. 2d at 1097.

22.     The second factor, the novelty and difficulty of the questions, recognizes that

attorneys should be appropriately compensated for accepting novel and difficult cases. This

factor also supports the requested 8.5% fee. The cap year claims are entirely distinct from the

claims litigated and settled in the first two partial settlement agreements. The factual and legal

framework out of which the cap year claims arose made this last phase an extraordinarily

difficult undertaking, which required great legal skill to achieve the unprecedented outcome. The

legal issue involved a novel question of how to interpret the ISDA in light of federal

governmental contract law and appropriations law. Until the victories in the Tenth Circuit and in

the Supreme Court, the Government had been almost entirely successful in defeating these types

of claims. On top of the liability issues was the difficulty of determining damages. The parties

disputed whether damages should be measured by a fixed-price or a cost-incurred methodology

and which contracts were eligible for CSC.

23.     The third factor, the skill requisite to perform the legal service properly, and the

ninth factor, the experience, reputation, and ability of the attorneys, together support the

requested 8.5% fee. Mr. Gross, Mr. Rogers, and Mr. Miller, along with their colleagues have a

unique expertise in a specialized and complex area of ISDA contract law. As this Court has

recognized, "'[a] limited number of attorneys in the United States share [Class Counsel's] level

of expertise and accomplishment' in the area of Indian law generally and indirect cost issues."

*Ramah II*, 250 F. Supp. 2d at 1312 (quoting *Ramah I*, 50 F. Supp. 2d at 1105). In particular,

Class Counsel exhibited unique ability in litigating the issue of cap year appropriations, through

this Court, the Tenth Circuit, and eventually the Supreme Court. However, their talents did not

stop with the court victories. They used their experience with ISDA issues to participate in an

arduous settlement negotiation process, involving complex statistical and accounting

calculations, document and financial analysis, and the coordination of findings by experts. In

addition, Class Counsel used their unique expertise to achieve from Congress full appropriations

in fiscal years 2014, 2015, and 2016 for all tribes.

24.     The fourth factor, the preclusion of other employment due to acceptance of the

case, likewise supports an award of 8.5% of the common fund. Without question, this case

required a significant commitment of time on the part of Class Counsel. Class Counsel was

representing virtually every Indian Tribe in the United States. As is evident from a cursory

review of the time records submitted with the Application, each attorney spent thousands of

hours on this case, which necessitated the refusal of other work. For example, Mr. Gross, a sole

practitioner, turned down an invitation to join a successful law firm in order to devote the

necessary time to this case after PSA I was finalized. (Gross Aff. ¶ 64.)

25.     Regarding the fifth factor, as the Court recognized in *Ramah I*,

> [t]he customary fee in a case such as this, outside the context of a class action, is
> the contingent fee arrangement, where counsel receives a percentage, usually 33
> 1/3 percent of the recovery, if there is any, and no fee if there is no recovery. In
> the class action context, the customary fee is established by the common fund
> doctrine and . . . [i]n the Tenth Circuit, the percentage method is the preferred
> method for establishing the fee.

50 F. Supp. 2d at 1104. In an affidavit attached to the Supplemental Application, Mr.

Gross testified that his customary fee for representing Tribes in litigation related to

unpaid CSC is 10% of any recovery. In 1991, Mr. Gross entered into a contract with

Ramah to serve as legal counsel in this litigation and agreed that if it was certified as a

class action, Mr. Gross would be compensated at 10% of the value of the judgment

"subject to any limitations imposed by the Court." (Second Gross Aff. (Doc. No. 1335-2)

¶ 2.) Mr. Miller stated that he represented 64 Tribes or tribal organizations in CSC related

cases against the IHS and his fee was a percentage that ranged from 15% to 33%

depending on the perceived risk of not prevailing, the estimated time that would be

devoted to the case, and the size of the claim involved. (Second Miller Aff. (Doc. No.

1335-3) ¶ 5.) Mr. Miller opined that cases taken by his firm prior to the *Cherokee*

decision were for a larger percentage due to the higher risk associated with the legal

landscape. (*Id.* ¶ 4.) Conversely, after the *Cherokee* decision, percentages tended to be

lower based on the lower perceived risk, and the risk was lowest after the *Ramah* case

was decided by the Supreme Court in 2012. (*Id.*) Based on these affidavits, the 8.5%

requested here is somewhat lower than the customary fee in this type of case.

  26. As for the sixth factor, Mr. Gross had a prearranged fee described in the previous

paragraph. Mr. Miller had an arrangement with Zuni that he would be paid between 10% and

25% of the recovery if the previous case, which was consolidated with this case, was certified as

a class action. This arrangement continued after Zuni was allowed to intervene and act as a Class

Representative. (Second Miller Aff. ¶ 12.) The requested 8.5 % fee is lower than both of the

prearranged fees in this case.

27.     The seventh factor concerns any time limitations imposed by the client or the circumstances, both of which in this case support the 8.5% fee. Throughout the pendency of this case, but more particularly, through the settlement process after the 2012 Supreme Court victory, Class members applied intense pressure to conclude the negotiation as quickly as possible for one main reason, Indian Country desperately needs the funds. "The members of the Class possessed few, and in some cases no, alternative sources to make up this underfunding. This circumstance created . . . a need to have this matter quickly resolved and to have the funds distributed to the Class." *Ramah II*, 250 F. Supp. 2d at 1314 (quoting, *Ramah I*, 50 F. Supp. 2d at 1105). In the fall of 2012, Class Counsel created a damages matrix based on the Government's own shortfall reports; but, faced with the Government's refusal to use those numbers, Class Counsel had to agree to the more arduous statistical process to determine an amount of total damages owed to hundreds of tribal contractors over twenty years. In the middle of the sampling process, Class Counsel took the bold step of making a written settlement offer, pushing for mediation, and in the end, acquiring a monumental settlement amount. Even after an amount of damages was determined, Class Counsel, who were pressed to expedite the distribution process, used a statistical analysis to predetermine each Class member's share of the settlement proceeds, which is memorialized in the FSA at Appendix 2.

28.     The eighth factor, the amount involved and the results obtained, strongly supports the 8.5% fee and carries the greatest weight in common fund cases. *Brown*, 838 F.3d at 456 (stating that the amount involved and the results obtained may be given greater weight). In this case, the results achieved in the courts and in the settlement are exceptional. The Government never wavered from its position that the appropriations caps completely exonerated any underpayment of CSC. That position, supported by a majority of court decisions, was changed

only after Class Counsel achieved a 2 to 1 victory at the Tenth Circuit, and settlement was possible only after a 5 to 4 victory at the Supreme Court. After the 2012 Supreme Court decision, the Class's claims increased from a questionable value to an ultimate value of $940,000,000, albeit as a result of three and one half years of settlement negotiations. After the Supreme Court ruled, however, the Class still faced a significant risk of decertification. Had the Government successfully pursued decertification, every Class member would have had to file a separate lawsuit, and go through the process of proving damages at a considerable expense in time and money. In addition, the benefits achieved for the Class go well beyond the $940,000,000 in damages. The victory on the cap year claims led to full appropriations funding for tribal contractors in fiscal years 2014, 2015 and 2016, adding $786,831,000 to the amount of CSC received by tribal contractors as a result of the Supreme Court decision in this case. To date, this collateral monetary benefit is almost as much as the settlement amount itself, and will continue in future years.

29.     The tenth factor, the undesirability of the case, supports the award requested. Prior to the 2012 Supreme Court decision, all court decisions on cap year claims were in favor of the Government. Thus, the cap year claims were considered undesirable and unwinnable by most experienced lawyers. In addition, this case was undesirable because there was a risk of decertification. *See Ramah II*, 250 F. Supp. 2d at 1314 (quoting *Ramah I*, 50 F. Supp. at 1105). This Court recognized that decertification was "a possibility." *Id.* at 1308.

30.     Although the eleventh factor is not significant to the fee award decision, it is easily met in this case. Mr. Gross has a long-standing professional relationship with Ramah that began in 1968. (Gross Aff. ¶¶ 5, 10, 11–20.) Mr. Rogers has a long history of providing legal services to the Oglala Sioux Tribe, the Pueblo of Zuni, the Pueblo of Laguna, the Mississippi

Band of Choctaw Indians, and the Ramah Navajo School Board. (Rogers Aff. ¶¶ 7–9.)  Mr.

Miller has represented several Tribes and tribal organizations including Artic Slope Native

Association, Ltd., the Cherokee Nation, the Ramah Navajo School Board, and the Shoshone-

Bannock Tribes. (Miller Aff. ¶ 9.) After the Supreme Court's decision in 2012, Mr. Miller has

settled over 450 contract support cost claims against the IHS for numerous Tribes and tribal

organizations. (*Id.*) *See Ramah I*, 50 F. Supp. 2d at 1106; *Ramah II*, 250 F. Supp. 2d at 1314–15

(recognizing the long-standing professional relationships between Class Counsel and Tribes and

tribal organizations).

31.    The twelfth factor is important to the award of 8.5% of the Settlement Amount

because it is consistent with awards approved in comparable mega fund cases. In fact, from a

review of awards in similar cases, the Court has determined that the request of 8.5% is somewhat

below the average of 10 to 15% awarded by other courts. *See infra*, Conclusion of Law 19. As

one court explained:

> According to one [empirical] study, in cases involving common funds "from $500
> million to $1 billion" in 2006 and 2007, "the mean and median awards were both
> 12.9%" of the fund. *In re AT & T Mobility Wireless Data Serv. Sales Tax Litig.*,
> 792 F. Supp. 2d 1028, 1033 (N.D. Ill. 2011) (citing Brian T. Fitzpatrick, An
> Empirical Study of Class Action Settlements and Their Fee Awards, 7 J.
> Empirical Legal Stud. 811, 839 (2010)). In other cases, where the class recovery
> exceed[s] $1 billion, courts have approved awards in the 5 to 10% range. *See,*
> *e.g.,Wal–Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 122 (2d Cir. 2005)
> (approving district court's award of 6.5% of $3 billion fund); *In re Enron Corp.*
> *Securities, Derivative & "ERISA" Litig.*, 586 F. Supp. 2d 732, 740, 828 (S.D.
> Tex. 2008) (approving award equal to 9.52% of $7.2 billion fund).
>
> *In re Black Farmers Discrimination Litigation*, 856 F. Supp. 2d 1, 40 (D.D.C. 2011). The

cases confirm that 8.5% of the $940,000,000 common fund is within or maybe below the range

of other mega fund fee awards.

32.     In approving this fee award of 8.5%, the Court has given due weight to the length and complexity of this phase of the case. Class Counsel achieved excellent results for their clients. They brought a great deal of experience to the case, and throughout the litigation they performed with considerable skill. After two decades of hard-fought litigation and settlement negotiations against a formidable opponent, Class Counsel created a $940,000,000 fund to settle the claims of 699 Class members, who constitute almost all tribes in the United States.

33.     Not one Class member has opted out and no objections to the settlement have been filed. USET objected only to being omitted from the Class members listed in the FSA, but USET did not object to the amount of the settlement or the reasonableness of the attorneys' fees. Mr. Fitzpatrick opined that the lack of Class objection to an attorneys' fee request is usually not important because, in general, class members often do not have a financial incentive to object. Mr. Fitzpatrick stated that in this case, however, many of the Class members have a substantial financial stake in the amount of attorneys' fees awarded because they stand to gain hundreds of thousands to millions of dollars in the settlement if the fee request is reduced. Despite this, no Class member objected to the fee request. (Decl. Brian Fitzpatrick ¶ 35.) The support of the Application by the Class is a significant, positive indication of fairness.

33.     In addition, the Government joined in the Application. Mr. Fitzpatrick stated that he has "never seen a class action settlement where the defendant affirmatively supported class counsel's fee request. Yet, that is what the federal government has done here. This endorsement carries special weight . . . because the federal government has a fiduciary responsibility to the class member tribes." (Decl. of Brian Fitzpatrick ¶ 36.)

**Reimbursement of Costs Incurred by Class Counsel**

34.     Class Counsel submitted a detailed accounting of their out-of-pocket nontaxable costs and reimbursable expenses. After reviewing the detailed itemizations of costs attached to each Class Counsel's affidavits, the Court finds that the costs were reasonably and necessarily incurred and that reimbursement of the costs out of the Settlement Amount, in addition to the award of attorneys' fees, is reasonable. Class Counsel incurred expenses and costs of $1,157,996.35 through August 31, 2015. In addition the FSA provides that Class Counsel will be reimbursed for their costs of providing Notice to the Class, as well as costs related to the distribution of the funds to Class members. These types of costs are customarily awarded in these actions. Alba Conte, 1 Attorney Fee Awards § 2.19 (3d ed. 2004). On January 14, 2016, Mr. Rogers submitted a supplemental affidavit outlining costs incurred in sending notice and other additional costs incurred from September 1, to January 12, 2016 in the amount of $9,202.26. Mr. Gross submitted a supplemental affidavit outlining costs incurred in sending notice and other additional costs incurred from September 1, to January 12, 2016 in the amount of $13,074.33. Mr. Miller submitted a supplemental affidavit outlining costs incurred in sending notice and other additional costs incurred from September 1, 2015 to December 31, 2015 in the amount of $25,716.98. These additional costs will be added to the total amount of costs to be reimbursed under the FSA. (*See* Second Rogers Aff. (Doc. No. 1339) ¶¶ 1–3; Third Gross Aff. (Doc. No. 1340) ¶¶ 1–2; Third Miller Aff. (Doc. No. 1341) ¶¶ 2–3.) Hence, the Court will award to Class Counsel a total of $1,205,989.92 as reimbursement for costs.

35.     This award of attorneys' fees and costs will be paid as provided in the FSA.

IT IS ORDERED that:

1.  the JOINT MOTION FOR FINAL APPROVAL OF FINAL SETTLEMENT

AGREEMENT (Doc. No. 1334) is granted, and the Final Settlement Agreement (Doc. No. 1306-

1) is approved;

2.  the APPLICATION FOR AWARD OF ATTORNEY FEES AND COSTS (Doc. No.

1313) is approved, and the CONSENT MOTION FOR FINAL APPROVAL OF CLASS

COUNSEL'S APPLICATION FOR AN AWARD OF FEES AND COSTS, WITH

SUPPLEMENTAL AUTHORITIES ADDRESSING THE ABSENCE OF OBJECTIONS (Doc.

No. 1335) is granted;

3.  Class Counsel will be awarded attorneys' fees calculated as 8.5% of the total amount

received from the Judgment Fund as provided in the Final Settlement Agreement; and

4.  Class Counsel will be reimbursed costs in the amount of $1,205,989.92 as provided in

the Final Settlement Agreement.

_____
SENIOR UNITED STATES DISTRICT JUDGE